**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOBY BOYCE, Derivatively on Behalf of Nominal Defendant SPRUCE POWER HOLDING CORPORATION, | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JONATHAN J. LEDECKY, BRIAN PIERN, THOMAS J. HYNES III, DIMITRI N. KAZARINOFF, JAMES H.R. BRADY, KEVIN GRIFFIN, CHRISTOPHER M. HAYES, SARAH SCLARSIC, DEBORA M. FRODL, NIHARIKA T. RAMDEV, DECLAN P. FLANAGAN, EFRAT EPSTEIN, and KATRINA ADAMS, | |
| Defendants, | |
| and | |
| SPRUCE POWER HOLDING CORPORATION, | |
| Nominal Defendant. | |

By and through his undersigned counsel, Plaintiff Toby Boyce ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Spruce Power Holding Corporation[1] and against certain current and former officers and directors of the Company for: (i) violations of §§ 14(a), 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) unjust enrichment; and (iv) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to

---

[1] Spruce Power Corporation is formerly known as XL Fleet Corporation and is referred to herein as "Spruce Power," "XL," "XL Fleet," or the "Company").

those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Spruce Power and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Spruce Power's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re XL Fleet Corp. Securities Litigation* (Case No. 1:21-cv-02002-JLR) (the "Related Securities Action"); (e) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated shareholder lawsuit captioned *In re XL Fleet (Pivotal) Stockholder Litigation* (C.A. No. 2021-0808-KSJM) (the "State Class Action"); and (f) review of other publicly-available information concerning Spruce Power and the Defendants.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action derivatively for the benefit of Nominal Defendant Spruce Power against certain of the Company's current and/or former executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from September 18, 2020 to the present (the "Relevant Period").[2]

2.    XL Fleet was formerly known as Pivotal Investment Corporation II ("Pivotal"), a

---

[2] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from September 18, 2020 to March 31, 2021, however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

special-purpose acquisition company ("SPAC"), which was incorporated on March 20, 2019 for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities.

3.     SPACs are publicly traded companies with no business activities, formed specifically to acquire an existing operating company. SPACs typically raise capital for the acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time, often 18 to 24 months. If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities. However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

4.     Amidst a recent boom in SPAC IPOs and acquisitions, SEC officials have noted widespread concerns including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype."[3] Similarly, SEC Chairman Gary Gensler recently testified to Congress, "the surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected? Are retail investors getting the appropriate and accurate information they need . . . ?"[4] As detailed below, the facts of this case exemplify the conflicts of interest faced by SPAC managers, as Defendants were incentivized to,

---

[3] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.
[4] Gary Gensler, May 26, 2021, Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee, *available at* https://www.sec.gov/news/testimony/gensler-2021-05-26.

and did, persuade Pivotal's public shareholders to consummate a business combination with XL that was not in their best interests.

5.      On July 16, 2019, Pivotal completed its IPO of 23,000,000 units ("Units"). Each Unit consisted of one share of Class A common stock, and one-third of one redeemable warrant, with each whole warrant entitling the holder to purchase one share of Class A Common Stock at a price of $11.50 per share. The Units were sold at an offering price of $10.00 per Unit, generating gross proceeds of $230,000,000 that were placed into a trust account. Simultaneously with the consummation of the IPO, Pivotal consummated the private placement of 4,233,333 warrants ("Private Warrants") at a price of $1.50 per Private Warrant, generating total proceeds of $6,350,000. The Private Warrants were purchased by Pivotal Investment Holdings II LLC ("Pivotal Investment" or the "Sponsor"), which was Pivotal's sponsor and an affiliate of certain of Pivotal's officers and directors. Pivotal's units, Class A common stock and warrants were listed on the New York Stock Exchange (the "NYSE") under the symbols PIC.U, PIC and PIC WS, respectively.

6.      While Pivotal had considerable discretion in identifying and consummating a business combination, there were three general limitations identified in Pivotal's Registration Statement filed on June 7, 2019.

7.      First, as required by NYSE rules, Pivotal had to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account at the time of its signing a definitive agreement in connection with its initial business combination.

8.      Second, Pivotal only had eighteen months to complete a business combination from the closing date of the IPO. If Pivotal did not complete a business combination in time (*i.e.*, by

January 16, 2021), its corporate existence would cease, except for purposes of winding up its affairs and liquidating. As such, Pivotal was required to hold the approximately $230 million of proceeds from its IPO in a trust account, and these funds were to be released only upon the consummation of a business combination or liquidation.

9.     Third, if Pivotal's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of Pivotal's obligation to redeem 100% of the public shares if Pivotal did not complete a business combination on time, Pivotal was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

10.     Prior to the IPO, Pivotal's Sponsor owned 95.7% of the initial shares of Pivotal. The Sponsor's members were (1) Ironbound Partners Fund, LLC, an affiliate of Defendant Jonathan J. Ledecky, Pivotal's Chief Executive Officer and Chairman of its board of directors, and (2) Pivotal Spac Funding II LLC, an entity that is affiliated with and controlled by Defendant Kevin Griffin, a Pivotal director. In addition, Defendant James H.R. Brady, Pivotal's Chief Financial Officer, owned 1.7% of Pivotal's initial shares, and Pivotal directors Sarah Sclarsic, Efrat Epstein, and Katrina Adams each owned less than 1% of Pivotal's initial shares. Collectively, the individuals and entities identified in this paragraph are referred to as the "Pivotal Initial Stockholders."

11.     The Pivotal Initial Stockholders held themselves out to investors as highly experienced businesspeople who had worked in finance and strategy, with successful track records in acquiring and growing businesses.

12.     The Pivotal Initial Stockholders acquired a significant interest in Pivotal prior to the IPO. Pivotal Initial Stockholders issued themselves 5,750,000 shares of Class B common stock

for an aggregate price of $25,000.00, and the Sponsor purchased 4,233,333 Private Warrants, each exercisable to purchase one share of Class A common stock at $11.50 per share, simultaneously with the IPO for an aggregate price of approximately $6.35 million (or $1.50 per warrant). The Pivotal Initial Stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if Pivotal did not complete a business combination by the deadline. Thus, if Pivotal did not meet its deadline, the Pivotal Initial Stockholders' shares and warrants would be rendered worthless.

13.     Following Pivotal's IPO, Pivotal's Initial Stockholders owned or controlled 20% of Pivotal's common stock, with the Sponsor owning or controlling approximately 19% of Pivotal's common stock, and Defendant Brady and the Pivotal directors, excluding Defendants Ledecky and Griffin, collectively owning or controlling approximately 1% of Pivotal common stock.

14.     On September 18, 2020, with time running out to complete a business combination before Pivotal's January 16, 2021 deadline, Pivotal issued a press release announcing that it had entered into a Merger Agreement (the "Merger Agreement") with XL Hybrids, Inc. (commercially known as XL Fleet), a provider of fleet electrification solutions for Class 2-6 commercial vehicles in North America. In the press release announcing the Merger Agreement, Pivotal stated that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." Defendant Ledecky further stated in the press release that "XL's revenues are expected to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles."

15.     The Merger Agreement provided that the parties would enter into a multi-step

business combination (the "Business Combination"), which would involve the following steps:

- First, PIC II Merger Sub Corp., a wholly-owned subsidiary of Pivotal and created for the purpose of facilitating the merger, would merge with and into XL Hybrids, with XL Hybrids surviving the merger (the "Merger");
- Second, XL Hybrids would become a wholly-owned subsidiary of Pivotal, with the securityholders of XL Hybrids becoming securityholders of Pivotal; and
- Third, an aggregate of 100,000,000 shares of Pivotal stock were issued or reserved for issuance to XL Hybrids' securityholders.

16.     The September 18, 2020 press release stated that "[t]he Pivotal and XL Boards of Directors have unanimously approved the proposed merger and the related transactions, which are expected to be completed in the fourth quarter of 2020, subject to, among other things, the approval by Pivotal's and XL's stockholders of the proposed merger and satisfaction or waiver of other customary closing conditions."

17.     In soliciting the requisite shareholder approval for the proposed transaction, Pivotal and its board of directors aggressively touted XL Hybrids' market opportunity and growth profile, proven technology, supply chain production capacity, strong position in its industry, compelling valuation, and scalable revenue model. Investors were told that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels." Pivotal claimed that XL Hybrids had more than 200 customers, that its average order size had grown from 350 units in 2019 to 1,100 units in 2020, that XL had $220 million in its sales pipeline for 2021, and that it expected a 300% increase in revenue growth over 2020. Further, Pivotal and its board emphasized XL Hybrids' strong, experienced management team, including the extensive, industry-specific background of Defendant Dimitri Kazarinoff, XL Hybrids' Chief Executive Officer, and Defendant Thomas J. Hynes III, its founder and Chief Strategy Officer. Pivotal also touted XL Hybrids' unique and highly scalable production model and differentiated product portfolio, claiming that it had garnered it world-class partnerships and

awards and was "positioned to leverage the production, supply chain and customer base we have in place today." Pivotal claimed that with the funding available if the Business Combination was approved, XL Hybrids could achieve greater than $1.3 billion in revenue by 2024.

18.     Pivotal and its board of directors further boasted to investors of their own professional and educational backgrounds. For example, Pivotal stated that Defendant Ledecky had an MBA from Harvard Business School, had executed hundreds of acquisitions across multiple industries, had raised over $20 billion in debt and equity, and that he would serve as a director of XL Fleet until 2023. Pivotal stated that Defendant Griffin had received a BSBA in Finance from Georgetown, had originated and invested more than $4 billion across the capital structure in middle market businesses, and that he would serve as a director until 2022. Pivotal and its board described to investors the extensive efforts they put into due diligence and negotiations with XL Hybrids which had started on July 24, 2020 and continued through at least September 17, 2020 when the Merger Agreement was signed.

19.     Only holders of record of Pivotal's common stock at the close of business on the December 7, 2020 record date were entitled to vote on the Business Combination at the December 21, 2021 annual meeting of Pivotal stockholders. As of the record date, Pivotal's Initial Stockholders owned or controlled Pivotal common stock and warrants with an aggregate market value of approximately $109.5 million, which would be rendered worthless if the Business Combination was not approved.

20.     As described herein, certain Defendants solicited votes from stockholders necessary to complete the Business Combination by means of: (1) Pivotal's October 2, 2020 Registration Statement, which was declared effective on December 8, 2020; (2) the December 8, 2020 definitive proxy statement and prospectus ("December 8, 2020 Proxy/Prospectus"); and (3)

other public statements that touted XL Hybrids' financial performance and operations, the extensive due diligence Pivotal purportedly conducted on XL Hybrids, and XL Hybrids' prospects for rapid growth. While the October 2, 2020 Registration Statement and December 8, 2020 Proxy/Prospectus recited potential risks that could arise in connection with the merger with XL Hybrids, it provided no reasons to suspect that Pivotal had failed to reasonably investigate such risks (or any indication that any of these potential risks had already substantially materialized). In short, Pivotal's shareholders had no reason to doubt the Defendants' characterization of XL Hybrids as a valuable business with strong future potential and a "Low Risk Path to Dramatic Growth."

21.    On or about December 22, 2020, the Company issued a press release announcing that the merger of XL Hybrids and Pivotal closed, resulting in the formation of XL Fleet, listed on the NYSE under the symbol "XL." The press release stated in relevant part:

> "Today is a significant milestone for XL Fleet and our employees and an important step forward for the commercial vehicle industry as we transform commercial fleets to build a more sustainable world," said Dimitri Kazarinoff, XL Fleet's Chief Executive Officer. "The closing of our merger with Pivotal will empower us to accelerate our growth strategy and bolster the industry's most comprehensive fully integrated fleet electrification platform, encompassing real-time data monitoring and analytics, propriety powertrain technology, power management, charging and storage. ***Our tested products, strong presence in the position XL Fleet as the partner-of-choice for our blue-chip customer base who recognize us as a key partner in helping them to meet their sustainability goals efficiently and at a lower cost***."[5]

> \*      \*      \*

> "We appreciate the overwhelming support received from shareholders of Pivotal, including 99.88% votes cast in favor of the merger between Pivotal and XL Fleet," said Mr. Ledecky. "We are exceptionally proud of XL Fleet's success to date and are excited to continue to support the Company and its talented team as it transitions to the public markets. ***With thousands of proven systems on the road today, millions of miles driven by hundreds of customers in mission-critical applications, and an asset light, highly scalable business model, I believe that XL***

---

[5] All emphasis is added unless otherwise noted.

*Fleet is poised to realize its vision of becoming a world leader in fleet electrification*."

22.     After the Business Combination, Defendants continued to present an optimistic picture about XL Fleet's business, operations, and prospects.

23.     For example, on January 13, 2021, the Company filed a Registration Statement and preliminary Prospectus on Form S-1 with the SEC completing its remaining registration obligations arising from the Business Combination with Pivotal.[6] On January 22, 2021, the January 13, 2021 Registration Statement became effective and XL Fleet filed a related Prospectus. Both the January 13, 2021 Registration Statement and January 22, 2021 Prospectus continued to tout XL Fleet's technology, sales pipeline, customer base, scalable production, supply chain capacity, and revenue growth, as indicators of future performance, as did Defendants' other public statements made after the closing of the Business Combination.

24.     The truth began to come to light on March 3, 2021, when Muddy Waters Research ("Muddy Waters") published a report (the "Muddy Waters Report") entitled "XL Fleet Corp. (NYSE: XL): More SPAC Trash," alleging, among other things, that XL's salespeople "were pressured to inflate their sales pipelines materially in order to mislead XL's board and investors" and that "customer reorder rates are in reality quite low" due to "poor performance and regulatory issues." Citing interviews with former employees, the report alleged that "at least 18 of 33 customers XL featured were inactive." Muddy Waters revealed that XL lost its California Air Resources Board ("CARB") approval in 2019 and failed to regain approval in 2020, and was unlikely to be approved in 2021, and thus XL could not sell in California. Muddy Waters also claimed that XL had "weak technology" and that "XL's announcement of future class 7-8 upfits

---

[6] The January 13, 2021 Registration Statement did not register the issuance of any new shares of common stock except for those shares of common stock issuable upon exercise of warrants that have previously been issued.

seems highly promotional" because the task is "too technologically complex for XL engineers to deliver on the promised timeline." On March 4, 2021, XL Fleet issued a press release which claimed that the Muddy Waters Report "contains numerous factual inaccuracies, misleading statements, and flawed conclusions" and stated that "[t]he Company intends to respond in due course."

25.     On news of the Muddy Waters Report, XL's share price fell $2.09, or 13%, to close at $13.86 per share on March 3, 2021, on unusually heavy trading volume. The share price continued to decline by $2.69, or 19.4%, over two consecutive trading sessions to close at $11.17 per share on March 5, 2021, on unusually heavy trading volume.

26.     Then on March 8, 2021, XL issued another press release reiterating its prior response to the Muddy Waters Report. This press release generally promoted XL's business and vaguely cast aspersions on the Muddy Waters report, while entirely failing to respond to many of Muddy Waters' core allegations. For example, XL's March 8, 2021 press release failed to deny that former employees had been instructed to inflate sales pipeline numbers.

27.     XL's partial denials did not assuage market concerns. The Company's share price fell $0.69, or 6.2%, to close at $10.48 per share on March 8, 2021, on unusually heavy trading volume.

28.     On March 31, 2021, XL held an earnings call to discuss its full year and Q4 2020 financial results. Defendant Kazarinoff claimed that as a result of the COVID-19 pandemic, which had been ongoing for more than a year at that point, "[m]any municipal departments, corporate clients and prospects who had planned fleet orders in 2020, particularly late in the year, postponed these potential orders due to major budget shortfalls. Together, this has impacted orders for shipment in the first and second quarters of this year." In addition, Kazarinoff stated, "multiple

production shutdowns during the pandemic, and the recent microchip and other shortages that caused major OEMs to shut-off fleet orders, creat[ed] a lengthy period early in the year without any new vehicle orders possible …. [I]t is possible that the impacts of these issues remain in place for a significant period of time."

29.     Defendant Kazarinoff also announced that XL only expected Q1 2021 revenues of approximately $1 million (substantially below analysts' consensus expectations of $7.9 million) and that the Company would no longer be providing guidance for the full year 2021, after previously having forecasted $75 million revenue for 2021. Specifically, Defendant Kazarinoff stated:

> [W]e are currently forecasting first quarter 2021 revenue to be roughly $1 million or roughly flat as compared to the first quarter of last year, driven by the ongoing OEM delays, amid microchip and other shortages. Given this ongoing uncertainty and the potential for extended industry-wide issues, combined with typical seasonal patterns in our orders and a significant majority of revenues focused on the second half, we are not currently providing formal full year 2021 financial guidance.

30.     On this news, XL's share price fell $1.09, or 12.1%, to close at $7.89 per share on April 1, 2021, on unusually heavy trading volume.

31.     The market interpreted the disappointing 2020 results and the withdrawal of XL Fleet's 2021 guidance as effectively a confirmation of the allegations of the Muddy Waters Report. For example, On April 8, 2021, Mad Money host Jim Cramer was asked by a caller how he "feel[s] about the Company XL Fleet." Cramer responded, "they came on here,[7] they told a decent story, but right after a guy [who] does a lot of good work, Carson Block,[8] said that this thing was not a good stock and that you should sell and then they proceeded to not do well. And so I have to tell you when a short seller says things are going to happen and then the things happen, well it makes

---

[7] On March 2, 2021, Defendant Hynes appeared on Cramer's show to discuss the Company.
[8] Carson Block is the founder of Muddy Waters and a well-known investor and short-seller.

me say let's stay away."

32.     Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (a) XL had materially manipulated and overstated its pipeline figures, (b) XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (c) a large number of the customers touted by XL were inactive and no longer ordering XL products, (d) the quality and benefits of XL's technology were overstated and that technology did not provide the miles-per-gallon ("MPG") savings to customers that XL represented, and (e) as a result of these omissions, Defendants' rosy assessment of XL's prospects and projections of future revenue were wildly overstated.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Company have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

34.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

35.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

36.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and

engaging in numerous activities that had an effect in this jurisdiction.

## III.   THE PARTIES

### A.   Plaintiff

37.    Plaintiff has been a shareholder during the Relevant Period and has continuously held shares of Spruce Power common stock to present.

### B.   Nominal Defendant

38.    Nominal Defendant Spruce Power is incorporated in Delaware and its current principal executive offices are located at 47000 Liberty Drive, Wixom, Michigan 48393. The Company's common stock trades on the NYSE under the symbol "SPRU."

### C.   Defendants

39.    Defendant Jonathan J. Ledecky ("Ledecky") has served as a director of XL Fleet (now Spruce Power) since December 2020 and now also serves on its Audit Committee. Prior to that, Ledecky served as Chairman and Chief Executive Officer ("CEO") of Pivotal since its inception, orchestrating the Merger with Hynes. Ledecky and Pivotal Spac Funding II LLC (an affiliate of Griffin) are the two managing members of the Sponsor. As disclosed in the Registration Statement, Griffin and Ledecky "ultimately controlled" the Sponsor. The Registration Statement further notes that Ledecky and Hynes "have been business acquaintances for 10 years as a result of Mr. Ledecky's decades-long relationship with Mr. Hynes' family." Defendant Ledecky currently holds nearly 10 million shares of Class A Spruce Power stock, representing approximately 6.9% of all total shares outstanding. Ledecky served as Chair and CEO of Pivotal I, a blank check company similar to Pivotal, from the inception of Pivotal I until in consummated its initial business combination with KLDiscovery in December 2019. Following the merger of Pivotal I with KLDiscovery, Ledecky continued to serve on the board of the combined company

until June 2021. As of April 2022, Ledecky held approximately 13.5% of KLDiscovery's total outstanding shares. Ledecky is a director, President, and COO of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV, where Brady also serves as an officer of each company and Sclarsic serves on the "Management" team. The Northern Star businesses, like the Pivotal entities, are special purpose acquisition companies. For the fiscal year of 2021, Defendant Ledecky received $269,501 in total compensation.

40.     Defendant Brian Piern ("Piern") served as XL Fleet's Vice President of Sales and Marketing from December 2020 through May 2021. Prior to that, Piern served in the same capacity at Legacy XL. During his time at XL Fleet and Legacy XL, Piern initially reported directly to CEO Hynes and later directly reported to CEO Kazarinoff. While at XL Fleet, Piern regularly made presentations to the Board. Prior to joining Legacy XL, Piern served as Senior Vice President of Sales at Element Fleet Management from September 2015 to December 2018. Piern previously held the same position at GE Capital, leading the development and execution of multimillion dollar sales strategies.

41.     Defendant Thomas J. Hynes III ("Hynes") founded Legacy XL in 2009, previously serving as its CEO from July 2009 through October 2019. He served as its Chief Strategy Officer at the time the Merger was being negotiated. Prior to the Merger, Ledecky had a "decades-long relationship" with Hynes's family, and Ledecky and Hynes had been "business acquaintances" for ten years. After the Merger, Hynes served as President and as a director of XL Fleet from December 2020 until March 2022, when he resigned from those positions and joined the Company's Advisory Board as its Chair. In connection with his March 2022 resignation, Hynes received lucrative separation pay of approximately $480,000. For the fiscal years of 2020 and 2021, Defendant Hynes received approximately $555,000 and $365,000 in total compensation,

respectively. He currently holds more than 7 million shares of Class A Spruce Power stock, representing approximately 5.2% of all total shares outstanding.

42.    Defendant Dimitri N. Kazarinoff ("Kazarinoff") served as CEO, Principal Financial Officer, and Principal Accounting of XL Fleet from December 2020 until November 2021 when he resigned from the Company. Kazarinoff also served as a director of XL Fleet during this time period. Prior to that, Kazarinoff served as CEO and President of Legacy XL between October 2019 and December 2020. As a result of the Merger, Kazarinoff's Legacy XL stock options converted into 1,206,851 shares of XL Fleet Class A common stock, worth over $23.5 million on the day of the Merger. Pursuant to his lucrative separation agreement with the Company (and approved by the Board), Kazarinoff received total compensation from XL Fleet exceeding $4.8 million for 2021.

43.    Defendant James H.R. Brady ("Brady") served as Chief Financial Officer ("CFO") of Pivotal prior to the Merger. Brady received 100,000 Founder Shares from the Sponsor prior to the IPO. In addition, he received 100,000 Founder Shares from both Pivotal I and Pivotal III. As Pivotal's CFO and one of only two Pivotal's officers, Brady was at all times substantially involved in Pivotal's activities regarding potential business combinations, including the decision to merge with Legacy XL. Brady further serves as CFO of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV, alongside Ledecky. Brady also serves as CFO of Pivotal III.

44.    Defendant Kevin Griffin ("Griffin") has served as a director of XL Fleet (now Spruce Power) since December 2020 and is a member of its Compensation Committee. Prior to the Merger, Griffin served as a director of Pivotal beginning in April 2019. He currently holds over 10 million shares of Class A Spruce Power stock, representing approximately 7.3% of all

total shares outstanding. Griffin is also an affiliate of Pivotal Spac Funding II LLC, which along with Defendant Ledecky are the two managing members of Pivotal's sponsor, Pivotal Investment Holdings II LLC (the "Sponsor"). As disclosed in the December 1, 2020 Registration Statement, Griffin and Ledecky "ultimately controlled" the Sponsor. Griffin is CEO and President of special purpose acquisition company Pivotal Investment Corporation III ("Pivotal III"), where he is also a director alongside Ledecky (Chairman), Brady, and Sclarsic. Pursuant to its current amended and restated certificate of incorporation, Pivotal III has only until August 11, 2023 to complete its initial business combination. Griffin also served as a director of Pivotal Acquisition Corp. ("Pivotal I"), a blank check company similar to Pivotal and Pivotal III, from September 2018 until it consummated its initial business combination with KLDiscovery in December 2019. Following the Pivotal I and KLDiscovery merger, Griffin continues to serve as a director of the combined company. As of April 2022, Griffin held approximately 22.5% of KLDiscovery's total outstanding shares. For the fiscal year of 2021, Defendant Griffin received $270,751 in total compensation.

45.     Defendants Ledecky, Piern, Hynes, Kazarinoff, Brady, and Griffin, and are collectively referred to herein as the "Securities Action Defendants."

46.     Defendant Christopher M. Hayes ("Hayes") has served as a director of XL Fleet (now Spruce Power) and Chair of its Compensation Committee since December 2020. Defendant Hayes was elected as Spruce Power's Board's Chair on January 1, 2023. Hayes also serves as a member of Spruce Power's Nominating and Governance Committee and on its Audit Committee. Prior to that, Hayes served as a director of Legacy XL since May 2018 and on its Finance Committee beginning in August 2019. Hayes has an extensive background in sustainably focused companies, including as the current managing partner and director of Alturus, an infrastructure investment company he founded in 2017. Hayes is also currently a director of N1 Health (formerly

17

Algorex Health Technologies LLC), a company Hayes founded that provides data science technology to the healthcare sector. For the fiscal year of 2021, Defendant Hayes received $297,001 in total compensation.

47.     Defendant Sarah Sclarsic ("Sclarsic") served as a director of XL Fleet (now Spruce Power) and as a member of its Audit Committee from December 2020 until December 31, 2022 when she resigned from these positions. Prior to the Merger, Sclarsic served as a member of Pivotal's board of directors since June 2019 and Pivotal's Audit Committee, and is a current director of Pivotal III. Sclarsic received 50,000 Founder Shares from the Sponsor prior to the IPO, which converted to 50,000 shares of XL Fleet Class A common stock upon the Merger's consummation. Sclarsic is a technology entrepreneur and advisor, consulting for companies in a wide range of areas, from drone delivery to financial software to gene therapy. Sclarsic advises such companies on several matters, including fundraising, business strategy, hiring, and communications. Sclarsic is listed among the "Management" team of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV on the companies' websites, where both Ledecky and Defendant Brady serve as officers. For the fiscal year of 2021, Defendant Sclarsic received $279,501 in total compensation.

48.     Defendant Debora M. Frodl ("Frodl") served as Spruce Power Chair and as a director of XL Fleet (now Spruce Power) from the close of the Merger on December 21, 2020 until December 31, 2022, when she retired from these positions. Effective as of the Merger's closing date, Frodl also served on XL Fleet's Audit Committee and its Nominating and Governance Committee (at one point serving as its Chair). Prior to that, Frodl served as a director of the pre-merger Legacy XL entity beginning in May 2018 and as Legacy XL's Chair between July 2019 and December 2020. In addition to her XL Fleet responsibilities, Frodl has served as a member of

the board of directors for the following companies: (i) Spring Valley Acquisition Corp., a publicly-traded SPAC focused on sustainability, since November 2020; (ii) Renewable Energy Group, Inc. ("Renewable Energy"), a public company focused on biofuels, since March 2018; and (iii) ITC Holdings Corporation, a private company focused on electricity transmission, since September 2020. Between December 2012 and December 2017, Frodl served as the Global Executive Director for Ecomagination at General Electric Company ("GE") focusing on clean technology strategy. Since 2018, Frodl is a certified Governance Fellow for the National Association of Corporate Directors. For the fiscal year of 2021, Defendant Frodl received $335,443 in total compensation.

49.    Defendant Niharika T. Ramdev ("Ramdev") served as a director of XL Fleet from December 2020 until May 2022, when Ramdev did not stand for reelection to the Board. During that period, Ramdev served as Chair of XL Fleet's Audit Committee and on the Company's Compensation Committee. At relevant times, Ramdev qualified and was designated as an "audit committee financial expert" as that term is defined in rules adopted by the SEC. Ramdev currently serves as a director of Renewable Energy alongside Frodl. For the fiscal year of 2021, Defendant Ramdev received $557,487 in total compensation.

50.    Defendant Declan P. Flanagan ("Flanagan") served as a director of XL Fleet from December 2020 until October 2021, when he resigned from the Company. During that period, Flanagan served as Chair of XL Fleet's Nominating and Corporate Governance Committee. For the fiscal year of 2021, Defendant Flanagan received $530,403 in total compensation.

51.    Defendant Efrat Epstein ("Epstein") was a director of the Company from December 2018 until completion of the Merger.

52.    Katrina Adams ("Adams") was a director of the Company from December 2018 until completion of the Merger.

53.     Defendants Ledecky, Griffin, Sclarsic, Epstein, and Adams are collectively referred to herein as the "Pivotal Defendants."

54.     The Defendants listed in ¶¶ 39-52 are collectively referred to herein as the "Individual Defendants.

55.     Defendant Spruce Power, along with the Individual Defendants are referred to herein collectively as the "Defendants."

**D.     Related Party Non-Defendants**

56.     Related Party Non-Defendant Christian Fong ("Fong") is currently a director of Spruce Power. Fong is named solely for purposes of demand futility. Fong joined as a director in September 2022.

57.     Related Party Non-Defendant John P. Miller ("Miller") is currently a director of Spruce Power. Miller is named solely for purposes of demand futility. Miller joined as a director on March 4, 2022.

58.     Related Party Non-Defendant Eric Tech ("Tech") is currently a director of Spruce Power. Tech is named solely for purposes of demand futility. Tech joined as a director since December 2021.

**IV.     FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

59.     By reason of their positions as officers, directors, and/or fiduciaries of Spruce Power, and because of their ability to control the business and corporate affairs of Spruce Power, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Spruce Power in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Spruce Power and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

60.     Each director and officer of the Company owes to Spruce Power and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

61.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

62.     Pursuant to the Audit Committee Charter[9] of Spruce Power, the purpose of the Audit Committee is to:

> [A]ssist the Board in its oversight of the quality and integrity of Spruce Power's financial statements, Spruce Power's compliance with legal and regulatory requirements, and the qualifications, performance and independence of the external auditors.
>
> The Committee shall (among other responsibilities and duties specified in this Charter):
>
> - independently and objectively monitor the effectiveness of Spruce Power's financial reporting process and systems of disclosure controls and internal controls;
> - select and engage Spruce Power's external auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
> - maintain and foster an open avenue of communication with the Company's management, internal audit group (if any) and the Auditors;
> - oversee the design, implementation, organization and performance of the Company's internal audit function (if any);
> - help the Board oversee the Company's legal and regulatory compliance, including

---

[9]     Available at https://s201.q4cdn.com/718822473/files/doc_downloads/2023/amended-and-restated-audit-committee-charter-final.pdf.

risk assessment;

- oversee the preparation of the Audit Committee Report for the annual proxy statement; and
- provide regular reports and information to the Board.

63.    Specifically, the Audit Committee has the following responsibilities, among others,

with respect to the Company's Financial Review and Disclosure:

**1      Annual Audit Results.** The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;
- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);
- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);
- the adequacy of the disclosures in the financial statements; and
- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

**2      Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

**3      Earnings Announcements.** The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies.

**4      Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**5      Accounting Principles and Policies.** The Committee will review and discuss with management and the Auditors significant issues regarding accounting

principles and financial-statement presentation, including:

- critical accounting policies and practices;
- alternative accounting policies available under GAAP;
- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and
- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal control letter, and monitor management's response to such communications. At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 16 and 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

**6 National Office Communications.** The Committee will review with the Auditors, as appropriate, any communications between the audit team and the Auditors' national office with respect to auditing or accounting issues presented by the engagement.

**7 Management Cooperation with Audit.** The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

64.     Specifically, the Audit Committee has the following responsibilities, among others,

with respect to the Company's Audit Management:

**8 Hiring and Selecting Auditors.** The Committee will retain, compensate, and oversee the work of any Auditors and any other registered public accounting firm engaged for purpose of preparing or issuing an audit report or related work. The Committee shall also be responsible for the resolution of disagreements between management and Auditors regarding accounting and financial matters. In addition, the Committee may replace any existing Auditors or other registered public accounting firm engaged for the financial reporting process with a different public accounting firm.

**9 Approving Audit and Non-Audit Engagements.** The Committee will review audit plans, the adequacy of staffing, the fees to be paid to Auditors, and oversee the negotiation and execution of any engagement letters on behalf of the Company. The Committee will oversee the rotation of the Auditors' partners on the Company's audit engagement team as required by applicable law and stock

23

exchange listing requirements. The Committee will approve all audit and non-audit related services that the Auditors provide to the Company before the engagement begins, unless applicable law and stock exchange listing requirements allow otherwise. The Committee may establish pre-approval policies and procedures or delegate pre-approval authority to one or more Committee members as permitted by applicable law and stock exchange listing requirements.

**10     Auditor Independence.** At least annually, consistent with PCAOB Rule 3526, the Committee will assess the qualifications, performance, and independence of the Auditors, or in the case of prospective Auditors, before they are engaged. That assessment will include reviewing written disclosures from any Auditors regarding any relationships they have that may affect independence, as defined by applicable law and stock exchange listing requirements. The Committee will review a written statement from any Auditors affirming their independence, and assess, consider, and discuss with them any potential relationships concerning their objectivity and independence.

**11     Auditor quality control procedures.** At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing (i) the Auditor's internal quality-control procedures (ii) any material issues raised by (a) that Auditors' internal quality-control review, (b) any peer review of the Auditors' internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors (iii) any steps taken to deal with any such issues.

**12     Former Employees of Auditors.** The Committee will oversee the policies and procedures as required by applicable law and stock exchange listing requirements governing how the Company may employ individuals who are or once were employed by the Auditors.

65.     Specifically, the Audit Committee has the following responsibilities, among others,

with respect to the Company's Internal Control and Procedures:

**13     Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information

security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

**14     Internal Auditors.** The Company does not currently have an Internal Audit function. When that function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, general audit approach and any significant difficulties or scope restrictions encountered in the function's work. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

**15     Internal Control Letters.** The Committee will review with the Auditors any "internal control" letter issued, or to the extent practicable, proposed to be issued by, the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

**16     Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including responsibilities, budget and staff of the internal audit function. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

**17     Correspondence with Regulators.** The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**18     Complaint Procedures.** The Committee will oversee procedures for receiving, retaining, and investigating the following:
- complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and
- confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

In addition, the Committee will oversee procedures for receiving, retaining, and investigating any "hotline" complaints or submissions delegated to the Committee by the Board.

**19     Ethical Compliance.** The Committee will review the results of

management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Corporate Code of Conduct and Ethics and Whistleblower Policy.

**20     Related Party Transactions.** The Committee will review and approve, in accordance with the Company's policies, any related party transaction as defined by applicable law or stock exchange listing requirements.

66.     Lastly, the Audit Committee is required to "annually evaluate its performance and the adequacy of this Charter."

67.     Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## Spruce Power's Standards of Business Conduct

68.     Pursuant to the "Corporate Code of Conduct and Ethics and Whistleblower Policy" (the "Code")[10] of Spruce Power, the purpose of the Code is "to provide our associates, as defined below, with a clear understanding of the principles of business conduct and ethics that are expected of them and to aid them in making decisions when conducting the Company's business and performing day-to-day duties."

69.     Regarding conflicts of interest, the Code states that:

Associates should avoid any situation that may involve, or even appear to involve, a conflict between their personal interests and the interests of the Company. In dealings with current or potential customers, suppliers, contractors, and competitors, each associate should act in the best interests of the Company to the exclusion of personal advantage. Immediate family members of associates, executive officers and directors are also covered in certain circumstances. For purposes of this section, an "immediate family member" in respect of any person means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such

---

[10] Available at https://s201.q4cdn.com/718822473/files/governance_doc/code-of-conduct-17-feb-23.pdf.

person, and any person (other than a tenant or employee) sharing the household of such person.

Associates and, in certain circumstances, their immediate family members, are prohibited from any of the following activities which could represent an actual or perceived conflict of interest:

- No associate or immediate family member of an associate shall have a financial interest in, or significant obligation to, any outside enterprise which does or seeks to do business with the Company or which is an actual or potential competitor of the Company, without prior approval of the Corporate General Counsel and the Company's Chief Executive Officer or, in the case of executive officers or members of the Board, without prior approval of the Board or a committee thereof; provided however, that this provision shall not prevent any associate from investing in any mutual fund or owning up to 1% of the outstanding stock of any publicly traded company.
- No associate shall conduct business on the Company's behalf with an outside enterprise which does or seeks to do business with the Company if an immediate family member of such associate is a principal or officer of such enterprise, or an employee of such enterprise who will play a significant role in the business done or to be done between the Company and such enterprise, without prior approval of the Corporate General Counsel and the Company's Chief Executive Officer or, in the case of executive officers or members of the Board, without prior approval of the Board or a committee thereof.
- No executive officer or employee of the Company, or immediate family member of an executive officer or employee of the Company, shall serve as a director, officer or in any other management or consulting capacity of any actual competitor of the Company.
- No director or immediate family member of a director shall serve as a director, officer or in any other management or consulting capacity of any actual competitor of the Company, without prior approval of the Board or a committee thereof.
- No associate shall use any Company property or information or his or her position at the Company for his or her personal gain.
- No associate shall engage in activities that are directly competitive with those in which the Company is engaged.
- No associate shall divert a business opportunity from the Company to his or her own benefit. If an associate becomes aware of an opportunity to acquire or profit from a business opportunity or investment in which the Company is or may become involved or has or may have an existing interest, the associate should disclose the relevant facts to the Corporate General Counsel. The associate may proceed to take advantage of such opportunity only if the Company is unwilling or unable to take advantage of such opportunity as notified in writing by the Corporate General Counsel.

- No associate or immediate family member of an associate shall receive any loan or advance from the Company or be the beneficiary of a guarantee by the Company of a loan or advance from a third party, except for customary advances or corporate credit in the ordinary course of business or approved by the Corporate General Counsel and the Company's Chief Executive Officer. Please see Section V.E. below, "Corporate Advances," for more information on permitted corporate advances.

In addition, the Audit Committee will review and approve, in advance, all related-person transactions, as required by the SEC, The New York Stock Exchange or any other regulatory body to which the Company is subject from time to time.

Each associate should make prompt and full disclosure in writing to the Corporate General Counsel of any situation that may involve a conflict of interest. Failure to disclose any actual or perceived conflict of interest is a violation of the Code.

70.     Regarding accurate records and reporting, the Code states that:

Under law, the Company is required to keep books, records and accounts that accurately and fairly reflect all Company transactions, dispositions of assets and other events that are the subject of specific regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the SEC. All Company reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Reports and other documents should state all material facts of a transaction and not omit any information that would be important in interpreting such report or document. Under no circumstance shall there be any unrecorded liability or fund of the Company, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of the Company. No payment on behalf of the Company may be approved or made with the intention, understanding or awareness that any part of the payment is to be used for any purpose other than that described by the documentation supporting the payment. In addition, intentional accounting misclassifications (e.g., expense versus capital) and intentional improper acceleration or deferral of expenses or revenues are unacceptable reporting practices that are expressly prohibited.

The Company has or will develop and maintain (a) a system of internal controls to provide reasonable assurance that transactions are executed in accordance with management's authorization, are properly recorded and posted and are in compliance with regulatory requirements and (b) disclosure controls and procedures to ensure that all of the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act

of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Associates are expected to be familiar with, and to adhere strictly to, these internal controls and disclosure controls and procedures, in each case to the extent applicable to their roles at the Company. For clarity, responsibility for compliance with these internal controls and disclosure controls and procedures rests not solely with the Company's accounting personnel, but with all associates involved in approving transactions, supplying documentation for transactions, and recording, processing, summarizing and reporting of transactions and other information required by periodic reports filed with the SEC. **Because the integrity of the Company's external reports to stockholders and the SEC depends on the integrity of the Company's internal reports and recordkeeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting. The Company is committed to full, fair, accurate, timely, and understandable disclosure in its periodic reports required to be filed with the SEC.**

Any associate who believes the Company's books and records are not in accord with these requirements should immediately report the matter to the Hotline, the Corporate General Counsel or the chairperson of the Audit Committee.

71.     Regarding document retention, the Code states that:

Numerous federal and state statutes require the proper retention of many categories of records and documents that are commonly maintained by companies. In consideration of those legal requirements and the Company's business needs, all associates must maintain records in accordance with these laws and any records retention policy that the Company may adopt from time to time. Any record, in paper or electronic format, relevant to a threatened, anticipated or actual internal or external inquiry, investigation, matter or lawsuit may not be discarded, concealed, falsified, altered or otherwise made unavailable after the associate in possession of such record has become aware of the existence of such threatened, anticipated or actual internal or external inquiry, investigation, matter or lawsuit. Associates must handle such records in accordance with the procedures outlined in the Company's Document Retention Policy, to the extent such a policy is in effect. When in doubt regarding retention of any record, do not discard or alter the record in question and seek guidance from the Corporate General Counsel. Associates should also direct all questions regarding document retention and related procedures to the Corporate General Counsel. **In addition, from time to time, the company may adopt additional specific written policies and procedures with respect to document retention or amend existing policies and procedures. All associates will be notified if such policies and procedures are adopted or if existing policies and procedures are amended.**

72.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Spruce Power, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Spruce Power.

74.     Because of their advisory, executive, managerial, and directorial positions with Spruce Power, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Spruce Power.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Spruce Power and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

76.     To discharge their duties, the officers and directors of Spruce Power were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Spruce Power were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as

to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Spruce Power conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Spruce Power was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.   BREACHES OF DUTIES

77.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Spruce Power and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Spruce Power, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Spruce Power, the absence of good faith on their part, and a reckless disregard for their duties to Spruce Power and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Spruce Power.

78.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the

Company's financial and business prospects were truthful and accurate when made.

79.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Spruce Power has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

82.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the

authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VII.   SUBSTANTIVE ALLEGATIONS

### A.     Special Purpose Acquisition Companies

85.     A "blank check company" is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person. One type of blank check company is a special purpose acquisition company, or SPAC. A SPAC is a publicly-traded company created specifically to pool funds through an initial public offering for the purpose of completing an acquisition or other business combination with an existing company.

86.     In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-market the investment offering to interested investors. A target company cannot be identified before the SPAC initial public offering is completed. Once capital is raised through the initial public offering, the proceeds must be deposited into a trust account. An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the

merger or acquisition.

87.     Typically, common stockholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. To this end, stockholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions.

88.     A SPAC shareholder may vote for or against a proposed business combination. A SPAC shareholder may decide to retain ownership of his or her SPAC shares, may request that the SPAC redeem their shares for his or her proportionate interest in the SPAC's trust funds, or may sell his or her shares on the open market.

89.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities (it is common for SPAC initial public offerings to include "units" consisting of both stock and out-of-the-money warrants). However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned back to investors. No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.

90.     Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to complete a qualifying transaction approved within the operating deadline.

91.     Indeed, numerous commentators have noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in a paper forthcoming in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[11] Based on empirical research of post-merger returns to SPAC shareholders, that paper goes on to conclude that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

92.     As set forth herein, Pivotal and XL exemplify the inherent conflicts with SPACs. The Defendants here were incentivized to, and did, persuade public investors to consummate the Business Combination between Pivotal and XL that was not in investors' best interests, by making material misstatements and omissions about XL Hybrids' business.

**B.     Background of Pivotal**

93.     Pivotal was a blank check company organized for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business combination with one or more businesses or entities. Pivotal's Sponsor was Pivotal Investment, whose members are Ironbound Partners, an affiliate of Ledecky, and Pivotal Spac Funding II LLC, an affiliate of Griffin.

94.     Pivotal was led by its Chairman and CEO, Ledecky, a seasoned businessman with over 35 years of investment and operational experience. Ledecky had executed hundreds of

---

[11] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (Oct. 28, 2020) Yale Journal on Regulation, Forthcoming, *available at*: https://ssrn.com/abstract=3720919.

acquisitions across multiple industries, including through several other blank check companies, and raised over $20 billion in debt and equity.

95.     Griffin served as a director of Pivotal. He also served as the CEO of Pivotal Spac Funding II LLC, one of the members of the Sponsor. He was also the CEO and CIO of MGG Investment Group, LP, a private investment firm managing long-term committed capital on behalf of leading endowment, foundation, pension, insurance and high net worth investors globally. Over the course of Griffin's career, he originated and invested over $4 billion across the capital structure of middle market businesses and served on numerous boards of directors.

96.     Pivotal was incorporated on March 20, 2019 and on April 25, 2019 it filed a Draft Registration Statement with the SEC. The Registration Statement for its Class A common stock and warrants was filed with the SEC on Form S-1 on June 7, 2019, and on July 11, 2019, it was declared effective. On July 15, 2019, Pivotal's final Prospectus (the "July 2019 Prospectus") was filed with the SEC, and on July 16, 2019, Pivotal completed its IPO.

97.     Pivotal stated in its July 2019 Prospectus:

> While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies in North America in industries ripe for disruption from continuously evolving digital technology and the resulting shift in distribution patterns and consumer purchase behavior. Most of these middle market and emerging growth companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading, high-growth participant will provide a public currency to fund consolidation and fuel growth. Segments we might explore include, but are not limited to, logistics technology and "last mile" delivery services, business technology services, online cyber security and off-line physical security services, media and entertainment services and franchise businesses.

98.     The July 2019 Prospectus further stated, "[w]hile we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies exploiting disruptive smart phone technology and the resultant rapidly changing

distribution patterns and evolving consumer purchase behavior."

99.    Pivotal's July 2019 Prospectus claimed, "we possess several competitive strengths to successfully source, evaluate and execute an initial business combination. We believe that the background, operating history and experience of our management team and special advisors have equipped us not only to provide access to a broad spectrum of investment opportunities, but also to significantly improve upon the operational and financial performance of a target business." It also stated that "[w]e intend to maximize our potential target investments by proactively approaching our extensive network of contacts, including private equity and venture capital sponsors, executives of public and private companies, merger and acquisition advisory firms, investment banks, capital markets desks, lenders and other financial intermediaries. We believe the prior investment experience and track record of our team will give us a competitive advantage when sourcing potential initial business combination opportunities."

100.    As detailed in the July 2019 Prospectus, while Pivotal had considerable discretion in identifying and consummating a business combination, there were three general limitations:

- First, as required by NYSE rules, Pivotal had to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (net of amounts previously disbursed to management for tax obligations and excluding the amount of deferred underwriting discounts held in trust) at the time of its signing a definitive agreement in connection with its initial business combination. Pivotal stated in its April 25, 2019 Draft Registration Statement that if its board of directors was not able to independently determine the fair market value of the initial business combination, it would obtain an opinion from an independent investment banking firm, or another valuation or appraisal firm that commonly renders fairness opinions with respect to the satisfaction of such criteria.

- Second, Pivotal had only eighteen months to complete a business combination from the closing date of the IPO. If Pivotal did not complete a business combination in time (*i.e.*, by January 16, 2021), its corporate existence would cease, except for purposes of winding up its affairs and liquidating. As such, Pivotal was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the

consummation of a business combination or liquidation.

- Third, if Pivotal's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of Pivotal's obligation to redeem 100% of the public shares if Pivotal did not complete a business combination on time, Pivotal was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

**C.      Pivotal Faced Pressure to Complete a Qualifying Business Combination by the January 16, 2021 Deadline**

101.    Due to the Pivotal Defendants' ownership interests in Pivotal and the terms and financial structure of Pivotal as a SPAC, the Pivotal Defendants possessed strong financial incentives to complete a qualifying transaction by the January 16, 2021 deadline. As that deadline grew nearer, the Pivotal Defendants faced increasing pressure to complete a transaction, irrespective of the merits of that transaction for Pivotal's public shareholders.

102.    Pivotal's Sponsor, Pivotal Investment, owned 95.7% of Pivotal's initial shares. The members of Pivotal Investment were Ironbound Partners, an entity affiliated with and controlled by Ledecky, and Pivotal Spac Funding II LLC, an entity affiliated with and controlled by Griffin. Ledecky and Griffin, therefore, were the ultimate owners of Pivotal's initial shares held by Pivotal Investment. Brady owned 1.7% of Pivotal's initial shares and the Pivotal Directors, excluding Ledecky and Griffin, each owned less than 1% of Pivotal's initial shares. Following Pivotal's IPO, Pivotal Investment would own approximately 19% of Pivotal's shares, and Brady and the Pivotal Directors, excluding Ledecky and Griffin, would collectively own approximately 1% of Pivotal shares.

103.    If a Business Combination was not consummated by January 16, 2021 (or a later date if approved by Pivotal's stockholders), Pivotal would cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to

the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, the 5,750,000 shares held by the Sponsor and Pivotal's directors and officers, which were acquired for an aggregate purchase price of $25,000 prior to Pivotal's initial public offering, would be worthless because the holders were not entitled to participate in any redemption or distribution with respect to such shares.

104.    In addition, the Sponsor purchased an aggregate of 4,233,333 private warrants from Pivotal for an aggregate purchase price of approximately $6.35 million (or $1.50 per warrant). These purchases took place via a private placement that occurred simultaneously with the consummation of Pivotal's initial public offering. According to the December 8, 2020 Proxy/Prospectus, the Pivotal Initial Stockholders' common stock and warrants had an aggregate market value of approximately $109.5 million on the record date of December 7, 2020. All of the proceeds Pivotal received from these purchases were placed in the trust account. The Pivotal Initial Stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if Pivotal did not complete a business combination the January 16, 2021 deadline. Thus, if Pivotal did not meet its deadline, the shares and warrants held by the Pivotal Initial Stockholders would be rendered worthless.

105.    As the January 16, 2021 deadline drew closer, the pressure on the Pivotal Defendants to complete a qualifying business combination increased. Between Pivotal's July 16, 2019 IPO and September 17, 2020 (*i.e.*, the first fourteen months of the eighteen month period), Pivotal identified and met with various potential target businesses to discuss a possible business combination, yet none of these discussions resulted in an executed letter of intent (other than the negotiations with XL Hybrids, described *infra*).[12] From July 16, 2019 IPO through at least March

---

[12] *See* Pivotal's December 8, 2020 Proxy/Prospectus at 80.

30, 2020, Pivotal stated in multiple SEC filings, "we intend to focus our search on companies exploiting disruptive smart phone technology."[13] As such, XL Hybrids did not fit Pivotal's stated profile for a target company, or at least what Pivotal claimed to be its "focus" for the first nine and a half months of the eighteen month period.

106.    Moreover, identifying a merger target, completing negotiations, finalizing merger documentation, and obtaining required shareholder approvals, is an extremely time-consuming process that requires at least several months to complete. For example, discussions between Pivotal and XL Hybrids began in July 2020, but the Business Combination was not completed until December 22, 2020, just weeks before its January 16, 2021 deadline.

**D.    Pivotal Announces its Execution of a Merger Agreement with XL and Misleadingly Touts XL's Growth Potential, Pipeline, Supply Chain Production Capacity, and Overall Prospects**

107.    The Relevant Period begins on September 18, 2020, when Pivotal and XL announced in a joint press release that they had entered into a merger agreement, subject to approval by Pivotal's and XL's stockholders (the "Merger Agreement"). According to the press release, the merged entity would have "an anticipated implied enterprise value of approximately $1 billion and no material debt expected to be outstanding."

108.    Additionally, on September 18, 2020, Pivotal filed with the SEC a Form 8-K that contained further information about the proposed merger transaction. Among other things, the Form 8-K included as attachments a copy of the September 18, 2020 press release, a copy of the Merger Agreement, and an investor presentation (the "Investor Presentation") that contained additional representations about XL's business. On the same day, Defendants conducted a conference call to discuss the proposed merger and Defendant Hynes appeared on CNBC's

---

[13] *E.g.*, Pivotal Form S-1 filed June 7, 2019 at 66; Pivotal IPO Prospectus filed July 15, 2019 at 66; Pivotal Form 10-K filed Mar. 30, 2020 at 1.

Squawk Box to provide further information to investors.

109.    Through these various channels, Defendants aggressively touted XL's growth potential, pipeline, supply chain production capacity, and overall prospects. For example, the September 18, 2020 press release stated that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." The press release also stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University." The Investor Presentation stated that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels." Defendant Hynes stated on Squawk Box that "we have the established supply chain production capacity. We have a very low risk and low cost production process compared to other companies the industry." The Investor Presentation also stated that the XL hybrid product could "[i]mprove MPG (~25%)," and that XL plug-in was "capable of driving up to 50% savings in MPG."

110.    As detailed below, these statements and others made by Defendants were materially false and misleading because they failed to disclose, *inter alia*, that (a) XL had materially manipulated and overstated its pipeline figures, (b) XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (c) a large number of the customers touted by XL were inactive and no longer ordering XL products, (d) the quality and benefits of XL's technology were overstated and that technology did not provide the miles-per-gallon savings to customers that XL represented, and (e) as a result of these omissions, Defendants' rosy assessment of XL's prospects and projections of future revenue were wildly overstated.

1.    **Background of XL Hybrids**

111.    XL Hybrids was founded in 2009 by its President and Chief Strategy Officer, Tod Hynes, and is a provider of fleet electrification solutions for Class 2-6 commercial vehicles in North America.[14] Hynes and XL Hybrids' Chief Executive Officer, Dimitri Kazarinoff, claimed to have decades of leading energy innovation, automotive, and electric vehicle ("EV") experience. XL Hybrids claimed that since its founding, it had deployed its hybrid and plugin hybrid electric drive systems, along with its cloud-based on-board telematics solution, on thousands of vehicles across hundreds of fleets throughout the United States and Canada.

112.    XL Hybrids claimed to be a trusted brand for over 200 of the largest commercial and municipal fleets in North America, with more than 3,200 XL systems deployed and over 130 million miles driven by customers as of December 8, 2020. XL Hybrids claimed that its customer base included FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University, among other blue-chip companies, municipalities, and institutions.

113.    A September 18, 2020 press release announcing the Merger Agreement asserted that XL Hybrids had "developed a flexible proprietary electrification powertrain platform that transforms traditional fossil fuel-powered fleet vehicles into hybrid and plug-in hybrid electric vehicles as they are manufactured. XL systems are available on a wide variety of Class 2-6 vehicles manufactured by Ford, Chevrolet, GMC, and Isuzu, and the Company is on track to provide its systems in Class 7-8 vehicles in 2022."[15]

---

[14] Class 2-6 vehicles include vehicles generally classified as light duty (less than 10,000 pounds) and medium duty (between 10,000 pounds and 26,000 pounds) under the gross vehicle weight rating system, such as utility vans, pick-up trucks, mini-bus, box trucks.

[15] Class 7-8 vehicles are heavier trucks between 26,001 and 33,000 pounds, and over 33,000 pounds, respectively, and usually have three axles or more, such as refuse vehicles, city transit buses, tractor trailers, and fire trucks.

114.    The September 18, 2020 press release stated that in addition to XL's electric powertrain platform, "XL provides real-time data monitoring and analytics, and will expand its 'Electrification-as-a Service' solution, which includes power management, charging infrastructure, and onsite power and storage offerings. XL is also developing all electric offerings. The Company's rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion, which incorporates the money spent on energy consumption and vehicle costs for commercial fleets globally."

**2.    XL's Need for Financing Gave Defendants an Incentive to Exaggerate its Sales Pipeline and Revenue Projections**

115.    Since at least 2019, XL had been regularly recording losses, and by middle of 2020, XL was experiencing a serious cash shortage and needed outside funds to continue as a going concern. Accordingly, the XL Individual Defendants had a strong incentive to exaggerate XL's sales pipeline and revenue projections in order to obtain additional financing or to present XL as an attractive target for a potential acquirer.

116.    As Pivotal acknowledged in its December 8, 2020 proxy statement and prospectus, at the time the Merger Agreement was executed, XL had a substantial working capital deficit, it was not generating profits and expected to continue to incur net losses, and substantial doubt existed about XL's ability to continue as a going concern:

> As of September 30, 2020, XL had a working capital deficit of $27.6 million and an accumulated deficit of $87.6 million. XL incurred a net loss of $20.0 million for the nine months ended September 30, 2020 and a net loss of $14.9 million for the year ended December 31, 2019.
>
> XL expects to continue to incur net losses in the short term ....
>
> XL's ability to access capital when needed is not assured and, if capital is not available when, and in the amounts needed, it could be required to delay, scale back or abandon some or all of its development programs and other operations, which could materially harm XL's business, prospects, financial condition and operating

results. Because of this uncertainty, there is substantial doubt about XL's ability to continue as a going concern ....

While management believes the funds to be raised in the Business Combination will alleviate the conditions that raise substantial doubt, it is not expected that such doubt can be alleviated prior to the consummation of the Business Combination.

117.    According to FE1, XL was always looking for investors and trying to raise money during her tenure at the Company (May 2019 through June 2020). According to FE2, when she was hired at XL Hybrids (in or around June 2020), she was informed that the company had enough financing to last until the end of 2020. FE2 stated that she was aware that XL was seeking further financing and needed such financing to continue operations.

### 3.    XL's Pipeline Inflation Scheme

118.    Even before Pivotal had identified XL as a potential acquisition target and started discussions concerning a potential merger in or around July 2020,[16] XL engaged in practices that caused its sales pipeline figures and revenue projections to be materially overstated.

119.    XL's pipeline figures and revenue projections were based on data collected by its sales team and entered into the Salesforce software system, a system for tracking sales opportunities with existing and potential customers. As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020:

XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections.

120.    As detailed by a number of former employees, XL manipulated the data in the

---

[16] Relevant details concerning the origins of the Business Combination, the timing of Pivotal's and XL's merger discussions, and Pivotal's due diligence into XL are set forth herein.

Salesforce system in a variety of ways, causing the Company's reported pipeline figures to be materially overstated. During a period that extended from at least Q4 2019 through Q3 2020, Defendant Piern, XL's Vice President of Sales and Marketing, would regularly instruct employees to (a) enter sales opportunities for particular customers in the Salesforce system without a reasonable basis, (b) record inflated percentage likelihoods of sales, and (c) maintain pre-existing entries in the Salesforce system after customers indicated that they would not be ordering products in the amounts recorded in Salesforce (or at all). In addition, Piern would frequently override and alter entries in the Salesforce system made by sales personnel to exaggerate and artificially inflate the percentage likelihood of a sale.

121.   For example, according to FE1, in November 2019, FE1 and Piern attended a National Association of Pupil Transportation conference. At this conference, FE1 and Piern spoke with five or six original equipment manufacturers ("OEMs") of school buses. These conversations were general in nature and not detailed enough to expect the OEMs to place orders with XL Hybrids. Nonetheless, Piern instructed FE1 to enter a five percent sales opportunity into XL's Salesforce.com sales tracking software for 100 units (equivalent to approximately $1.6 million in potential sales) for each of these OEMS, totaling 500-600 units (equivalent to approximately $8.0-$9.6 million in potential sales).

122.   As another example, at a weekly sales meeting, Piern instructed FE1 to identify large commercial fleets and enter those as sales opportunities even if FE1 had not spoken to anyone at those companies. Piern gave FE1 such instructions irrespective of whether or not the companies in question even had vehicles that were compatible with XL Hybrids' products.

123.   According to FE1, all the sales opportunities entered into the Salesforce.com software became part of XL Hybrids' sales pipeline.

124.    FE1 also recalled an instance in which one of XL's customers, Pepsi, after purchasing 10 units as a trial run, communicated to XL that it would not be ordering additional XL products. FE1 stated that Piern knew that Pepsi had no intention of making any additional purchases. After a meeting with Pepsi in which FE1 was informed that Pepsi would not be buying any additional XL products, FE1 updated XL's Salesforce.com software to note this information, and to reflect a zero percent chance of Pepsi ordering additional products. FE1 later saw that the Salesforce data had been changed to reflect a sales opportunity with a five percent likelihood for Pepsi. FE1 stated that Piern often changed the percentages associated with possible sales that had been entered by sales people in XL's Salesforce software. In the experience of FE1, Piern's changes always reflected an increased likelihood of completing a sale.

125.    FE2 also recounted an instance in which Piern directed the artificial maintenance of a sales probability in Salesforce even after information received from a customer indicated that the sales probability lacked a reasonable basis. For example, in the third quarter of 2020, an individual employed by a potential customer in the elevator industry informed FE2 that the elevator company might be interested in purchasing 400 units of XL products (representing approximately $6 million in sales). FE2 entered this sales opportunity into Salesforce.com for 2021 with a 75% probability. However, FE2's contact then left the elevator company, and it became clear to FE2 from ongoing conversations that any purchase from the elevator company would be spread out over a multiple year period, as the company had a five-year plan to achieve certain sustainability goals. As such, FE2 informed Piern before the end of 2020 that this opportunity should no longer be reflected in Salesforce as a 75% probability of a 400 unit purchase in 2021. Nonetheless, Piern told FE2 to maintain this sales opportunity as a 75% probability in Salesforce.

126.    According to FE2, one practice used to increase XL's pipeline figure was the

transmission of pricing information to potential customers. FE2 stated that if pricing was sent to a potential customer, the sales opportunity was increased from 5% to 25% in Salesforce, even if the potential customer did not indicate a lot of interest. Therefore, FE2 would often send quotes to potential customers to increase the reported probability of a sale in Salesforce.

127.    FE2 recalled that the sales pipeline was approximately $220 million during her time at XL (between June 2020 and February 2021).[17] FE2 stated the sales pipeline was a weighted average of all the opportunities, based on the assigned percentages in Salesforce. FE2 believed that the sales pipeline was overstated due to the practices described above.

128.    The Muddy Waters Report provides additional accounts of former employees that further corroborate XL's pipeline inflation practices. According to Muddy Waters, Former XL Employee A stated, "I was paid to lie. I was paid to falsify and exaggerate my pipeline." The same employee further stated:

> Once a quarter before board meetings, I would find that a bunch of my deals with larger [potential sales] numbers behind them would have been exaggerated substantially in their probability to close: from 25% up to 75%. For that brief week when the board was in town, my deals were at 75%, and I would have nothing to do with that. That was [manager name redacted]. A minimum of four times a year he would exaggerate my pipeline substantially to report to the board.

129.    As mentioned *supra*, FE3 confirmed that she was the individual identified as Employee A in the Muddy Waters Report, and that the statements attributed to her are correct and accurate. FE3 also stated that Piern often increased the percentages entered into Salesforce and sometimes made up "bogus" companies and entered opportunities for those companies. In addition, FE3 said Piern had her enter sales opportunities for companies in California, which were all false because XL could not sell in California because it had lost CARB (California Air

---

[17] This amount was reported as XL's sales pipeline for 2021 in multiple public statements from Defendants between September 18, 2020 and December 8, 2020.

Resources Board) approval.[18]

130.    According to Muddy Waters, Former XL Employee B stated, "Even if [potential customers] have no interest, my boss tells me to go into Sales force and create an opportunity for 100 chassis with hybrid systems in it ... You're talking another $1 million or $2 million that goes into the pipeline that's really not there."

131.    According to Muddy Waters, Former XL Employee C stated, "I was told to [exaggerate my pipeline], but I didn't do it. That was, yes, it wasn't that good for me." According to Muddy Waters, Former XL Employee C was subsequently laid off.

### 4.    Prior to the Pivotal Transaction, XL Had Been Experiencing Supply Chain Problems that Impeded its Ability to Timely Fill Existing Orders

132.    While Hynes stated on his September 18, 2020 appearance on Squawk Box that XL had an "established supply chain production capacity" and a "very low risk and low cost production process compared to other companies in the industry," in fact XL lacked reliable access to essential supplies, and this was known to XL management. These supply problems prevented XL from timely filling orders to customers and converting its existing backlog into revenue, discouraged customers from placing new orders, and rendered XL's revenue projections unrealistic and misleading.

133.    One of the key components of XL's hybrid electric vehicle and plug-in hybrid electric vehicle products is a lithium ion battery pack. According to FE1, XL's products could not be shipped to customers unless they included batteries, because without batteries the products would be incomplete and the customers would not pay for them.

134.    During the first week that FE1 worked at XL Hybrids in May 2019, she traveled to

---

[18] In its March 8, 2021 response to the Muddy Waters Report, XL admitted, "In fact, while XL Fleet did lose CARB approval status in 2019 and was unable to secure re-approval in 2020 due in part to the COVID-19 pandemic, the Company expects to receive CARB re-approval in 2021."

Boston for a sales team meeting, at which Piern informed the sales team that XL Hybrids was having issues getting batteries from its supplier LG. Then-CEO Hynes was present at this meeting.

135.    According to FE1, during her tenure at XL Hybrids (May 2019 to June 2020), XL Hybrids did not make its own batteries, but contracted with third-party supplier LG to provide them. FE1 explained that the same batteries used by XL Hybrids were used by Chrysler for its Pacifica hybrid electric minivan, and that LG viewed supplying Chrysler as a priority over XL Hybrids. During FE1's tenure, XL Hybrids could sometimes obtain one or two batteries at a time from LG, but was only able to obtain a minimal amount of batteries.

136.    According to FE1, battery supply was essential to XL Hybrids' ability to make sales, and customers who had placed purchase orders but not received them due to XL Hybrids' delays in obtaining batteries were hesitant to make additional purchases from XL Hybrids.

137.    According to FE4, when she was hired in May 2019, she specifically asked about the supply chain and how well it operated. FE4 was concerned that since XL was a "small fish," it might not be able to get the components it needed to build the product. She was assured that the supply chain was not an issue. By September 2019, however, she was informed that the company was having challenges obtaining batteries because a larger company was taking priority. FE4 said LG was XL's battery supplier. FE4 stated that XL could not fulfill purchase orders without batteries and that she would inform affected customers that there would be delays and tried to provide approximate timeframes for when the orders would be fulfilled. FE4 stated that the supply chain issue impacted her ability to meet her sales quota. According to FE4, XL's difficulty in obtaining batteries continued at least until the time she left the company in March 2020.

138.    Supply chain difficulties persisted into the Relevant Period. According to FE2, during her tenure at XL (June 2020 to February 2021), XL continued to have problems obtaining

parts which led to backlogged orders not being delivered. FE2 recalled difficulties obtaining batteries, and hearing that XL's battery supplier had informed XL that larger customers ordering more batteries were a priority over XL.

139.    The accounts of former employees in the Muddy Waters Report further corroborates the existence of serious supply chain problems. As detailed in the Muddy Waters Report, Former Employee A stated, "All of 2019 there were essentially zero batteries delivered. In the first six months of 2020, they got line of sight on maybe 90 ... to the point where as soon as they got them, they would go to the most pissed off customer: 'Okay, you can have five batteries.'"

140.    Similarly, according to Muddy Waters, Former Employee B stated:

When I started, they were using LG batteries in all their stuff. Chrysler took all the allocation for all their batteries. They were testing and retesting and trying to validate … by the time I left, they still didn't have a decent supply chain of the battery to get it going where it was. The whole time I was there, they didn't have a battery.

141.    According to Muddy Waters, Former XL Employee C stated:

Deliveries weren't happening ... It's like, 'Can you tell me the truth, so I can get my fleets in order?' ... It caused angst with me, because I think that there were some things in the supply chain that they [management] just really knew ... 'Oh, just let them know it'll be 30 days.' Then 30 days passes. 'Well, let them know it'll be another 30 days.'

142.    Due to these supply chain problems, XL's backlog of orders remained stagnant and did not efficiently convert into revenue. According to FE1, XL Hybrids' order backlog remained at roughly similar levels during her tenure, without old orders shipping (due mostly to lack of battery supplies), and without new orders coming in. As such, FE1 believed that order backlog was not an accurate representation of XL Hybrids' actual capability to generate future revenue. While Defendants did not report a backlog figure in their public statements on September 18, 2020, Defendants subsequently did report a backlog figure in multiple public statements between

October 2, 2020 and January 22, 2021, and misleadingly touted this figure as an indicator that XL's future revenues were likely to be robust. *See infra*.

143.    Independent of the role that XL's backlog played as a stand-alone metric that was misleading to investors as an economic indicator in its own right, XL's backlog also was factored into Defendants' revenue forecast, and Defendants' failure to disclose XL's ongoing supply chain problems rendered that forecast materially misleading. Indeed, Defendants' forecast of $75 million in revenue for 2021 assumed both a massive increase in new orders being ***placed*** and an even greater increase in both new and old orders being ***filled***. That forecast was incredibly unrealistic in light of the persistent supply chain difficulties that XL faced in satisfying a much smaller volume of orders.

144.    While Defendants did offer certain risk warnings and other disclosures concerning battery supply issues during the Relevant Period, those disclosures were themselves highly misleading. As detailed infra, Defendants in those disclosures Defendants portrayed the supply issues as limited in scope, related solely to COVID, and, most importantly, having been resolved by the second half of 2020. In reality, the supply problems were severe, longstanding (predating COVID by almost a year), related to XL's lack of market power and leverage as a buyer in the battery market, and ongoing throughout the Relevant Period. *See infra*. Accordingly, Defendants' failure to disclose the true nature and magnitude of XL's supply chain problems caused investors to substantially underestimate the enormous risks inherent in Defendants' revenue forecast for 2021.

### 5.    XL's Customers Had Low Reorder Rates and Many of the XL Customers Touted in the Investor Presentation Were Inactive

145.    Although Defendants portrayed XL Hybrids as a "[t]rusted brand helping fleets drive decarbonization today," and specifically identified 33 high profile customers by name in the

investor presentation published on September 18, 2020, many of these customers had ceased doing business with XL, in many cases because they found XL's technology to deliver poor results on their prior purchases.

146.    FE1 confirmed that certain companies touted as customers in Defendants' statements were no longer active customers and did not intend to purchase additional XL products. FE1 stated that two of her customers, Pepsi and Safelite, had only purchased 10 units as a trial run to verify performance, and that both companies had communicated to XL Hybrids that they would make no further purchases, and that FE1's supervisor Piern knew these customers had no intention of making further purchases.

147.    FE2 similarly confirmed that many of the purported customers identified in XL's investor presentation had not ordered products from XL in several years. FE2 stated that Comcast, Verizon, AT&T, UPS and FedEx had not ordered XL products in approximately seven years, and that they would not be ordering XL's hybrid products in the future because they were planning to purchase fully electric vehicles instead.

148.    The Muddy Waters report likewise confirmed that XL's customers had low reorder rates and many of the XL customers touted in the September 18, 2020 investor presentation were inactive.

149.     The Muddy Waters Report quoted "Former XL Employee A" as stating "Almost no one reorders . . . it's maybe 10%."

150.    Based on interviews with three former XL employees, Muddy Waters reported that 18 of 33 advertised "customers" had not ordered any XL products over at least 2019 through the first half of 2020. These inactive customers included: Alabama Power, DHL, Ferguson, Clark Public Utilities, CalVans, Southern California Edison, SDGE, Portland General Electric, Coca-

Cola, Verizon, ThyssenKrupp, Stanley Black & Decker, ComEd, Hawaiian Electric, Safelite, City

of Seattle, DTE Energy, and Pepsi.

151.    The Muddy Waters report also quoted former XL employees and a former XL

customer discussing specific purported "customers" that had only purchased XL products for small

pilot programs and never made follow-up purchases. For example, Muddy Waters quoted one such

source as saying regarding Ferguson, "Just a pilot, two or three trucks; they haven't repeated the

order and it's been three to four years."

> **6.    The Quality and Benefits Of XL's Technology Were Overstated and
> that Technology Did Not Provide the MPG Savings or ROI to XL's
> Customers that XL Represented**

152.    Although the Defendants publicly touted supposedly impressive mileage gains and

return on investment to customers using XL Hybrids' products, in reality XL Hybrids' customers

often experienced minimal mileage gains and negative returns on their investments.

153.    FE2 stated that she sold zero products during her tenure with the Company, due in

substantial part to the fact that XL products were too expensive, such that the return on investment

was not enough to make the cost worthwhile for potential customers. According to FE1, some XL

Hybrids customers complained that their vehicles' realized miles per gallon of fuel decreased after

purchasing XL Hybrids products.

154.    FE4 explained that for some customers, XL products did not make sense. For

example, customers in rural areas might not see a return on investment. FE4 stated that fleet

managers would not purchase products unless they would receive a return on investment, meaning

that the purchase has to result in overall cost savings for the fleet. Some customers to whom FE4

tried to sell additional XL products were not interested because they did not obtain sufficient ROI

on their prior purchases from XL, and XL had increased its product prices thus making customers'

expected ROI on new purchases even lower.

155.    FE1 questioned some of the assumptions underlying the return on investment example calculations presented by Defendants to investors (and reproduced in Pivotal's SEC filings). FE1 noted that the assumed $3.00 per gallon of gasoline was high for most areas of the country at the time. FE1 also believed that the "Driver Productivity Savings" metric used in XL's ROI example calculation was useless and just an effort to make XL's marketing look appealing.

156.    According to FE2, the ROI information provided in the Seattle case study referenced in XL Hybrids' investor presentations (and reproduced in Pivotal's SEC filings) does not seem accurate, and FE2 could not figure out how the company arrived at the numbers presented in that case study. FE2 explained that the customer that was the subject of that case study had received a substantial volume discount, and that the fuel cost assumptions used seemed high. FE2 did not trust the numbers from XL about product performance, and so FE2 calculated her own numbers when presenting to potential customers.

157.    The Muddy Waters Report likewise confirmed that benefits of XL's technology were overstated and that its technology did not provide the MPG savings or ROI to XL's customers that XL publicly represented.

158.    The Muddy Waters Report quoted "Former XL Employee A" regarding XL's MPG and ROI claims, who stated "[t]heir numbers are based upon a bare-boned F-150 on a dyno [dynamometer] in optimal, optimal circumstances, but the second you add weight or a passenger or human error to that, it all goes out the window." Regarding XL's claims of up to 50% MPG improvement from its plug-in product, Muddy Waters quoted "Former XL Employee A" as stating, "Never would you come across 50% on the plug-in ... The 50%, it's insane that it's advertised ... You might see a decrease in MPG because you're adding 800 pounds of batteries to the back of

an F-150 and expecting it to achieve performance." Muddy Waters further quoted "Former XL

Employee A" regarding her interactions with customers:

> You do have fleet managers that are very savvy and they check their fuel spending. It's the guys that don't care about the PR, they care about performance. Those guys would be calling me daily being like, 'Dude, this thing's broken down. I'm not seeing any improvement, if anything maybe 1% to 2% per $25,000.' There's no return on investment, zero.

159.    The Muddy Waters Report quoted multiple former XL employees as stating that

XL's publicly touted MPG gains were based on optimal conditions, and that real-world use of

XL's products resulted in dramatically lower MPG gains. For example, although XL advertised

up to 50% MPG savings for its plug-in product, a former employee stated that average MPG gains

for this product were only 25-35%. And while XL advertised approximate MPG improvement of

25% for its hybrid product, another former employee stated that outside of an optimal city drive

cycle MPG savings for this product were probably only 5-10%.

160.    The Muddy Waters report identified specific former XL customers that had

experienced poor ROI and had ceased ordering XL products, such as Portland General Electric,

Pepsi, and Alabama Power. Muddy Waters also quoted former XL employees as stating that a lot

of customers complained about poor results, lack of return on investment, and failure to meet

expectations. Muddy Waters quoted a Fleet Manager and Former XL Customer as stating,

"[s]omeone would probably not save money at $13k [per kit] on a pure fuel basis."

161.    Muddy Waters reported that XL took steps to conceal the performance of its

products from customers who had purchased them, quoting former employees as stating that XL

refused to give customers access to the XL Link system that recorded data on the products'

performance, and that XL employees would try to make this data seem better than it was when

discussing it with customers, and to deflect blame for poor performance.

#### 7.   XL's Revenue Projections Were Materially Misleading and Lacked a Reasonable Basis

162.    For all the reasons set forth above, Defendants' forecast of $75 million in revenue for 2021 was materially misleading and lacked a reasonable basis.

163.    According to Defendants, XL's sales pipeline was a critical input into its revenue forecast. As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020, "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections." Accordingly, the inclusion of non-viable sales opportunities in the pipeline and the exaggeration of the recorded likelihood of sales had the effect of not only inflating the sales pipeline figure but also inflating the revenue forecast upon which it was based.

164.    Similarly, XL's supply chain problems, low customer reorder rates, large number of inactive customers, and the weakness of its technology (including the inability to deliver the MPG savings and ROI that XL represented to its customers) all operated to render XL's revenue forecast unrealistic and undermine the assumptions upon which that forecast was based. Defendants' failure to disclose these factors caused the market to materially underestimate the risk that XL's forecast would not be achieved.

165.    Additional facts support the conclusion that XL's revenue forecast lacked a reasonable basis and was likely unachievable. According to FE2, FE2 was not able to sell any products during her tenure at XL, which she attributes in part to the fact that these products were too expensive for their emission reduction capabilities, and that the return on investment was not enough to make the cost worthwhile for customers.

166.    FE2 was given a sales target of $12 million for 2021, even though she had never been able to sell an XL product, and even though the entire company had only $20.3 million in

2020 revenues. This sales target was not based on identified sales opportunities, but rather was simply imposed by XL executives.

167.    According to FE2, Hynes and Kazarinoff told Piern that the sales team as a whole needed to sell $75 million for 2021, and the sales team was not allowed to offer any feedback on whether this target was achievable. According to FE2, Piern then simply divided up the $75 million total sales target among the sales team, assigning FE2 $12 million of the total without much reasoning other than the need to divide up the total target.

168.    Leading up to the Business Combination, XL repeatedly disclosed its projection of $75 million in 2021 revenue.

169.    FE2 did not believe that her $12 million 2021 sales target was possible to meet with only hybrid products to offer. XL projected that hybrid products would account for substantially all of its 2021 sales.

170.    Similarly, according to FE1, during her tenure at XL Hybrids, neither she nor anyone else met their sales goals.

171.    Taken together, the foregoing facts tended to seriously undermine the accuracy of XL's revenue forecast and the failure to disclose these facts rendered the issuance of the forecast and Defendants' related statements materially misleading.

E.    **Defendants Aggressively Promoted the Proposed Merger Following its Announcement**

172.    From Defendants' first public announcement of the proposed Merger on September 18, 2020 up to the Merger's completion on December 21, 2020, Defendants aggressively and misleadingly promoted the proposed Merger and XL Hybrids' business prospects in numerous public statements, in an apparent effort to build investor support for the Merger.

173.    XL Hybrids issued at least eight, highly promotional press releases during this

period, each of which promoted the proposed Merger and touted XL Hybrids' technology and customer base.

174.    For example, XL Hybrids issued a September 30, 2020 press release titled "XL Fleet to Accelerate Rapid Growth and Expand Fleet Electrification Solutions Through Proposed Merger with Pivotal Investment Corporation II." XL Hybrids stated in an October 26, 2020 press release that it was "revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." In a November 1, 2020 press release titled "XL Fleet Generates Record Third Quarter 2020 Revenue," XL Hybrids reiterated its $220 million sales pipeline and $75 million 2021 revenue forecast, in addition to promoting "record quarterly total GAAP revenue of $6.3 million for the third quarter of 2020."

175.    XL Hybrids issued similarly promotional press releases on November 16, 2020, November 23, 2020 ("XL Fleet Expects its Largest Partner to Double Orders in 2021"), December 1, 2020, December 11, 2020, and December 16, 2020 ("XL Fleet Expands Electrification Solutions Portfolio to Ford F-550 Chassis to Meet Strong Customer Demand").

176.    Simultaneously with this barrage of promotional press releases, Defendant Hynes and other Individual Defendants, gave multiple interviews to financial media, apparently as part of the public relations strategy to build investor support for the proposed Merger. As with XL Hybrids' press releases, the Individual Defendants in these interviews promoted the proposed Merger, and touted XL Hybrids' technology, customer base, sales pipeline, and revenue projections.

177.    On October 26, 2020 Defendants Hynes and Kazarinoff, as well as Pivotal representative Greg Racz, appeared in a webinar hosted by SPACInsider to promote XL Hybrids

and the proposed Merger. Defendant Kazarinoff stated, "Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue."

178.    On November 12, 2020, Defendant Hynes gave an interview on Bloomberg TV similarly touting XL Hybrids' business prospects. He stated, "We're growing extremely rapidly already . . . we're already experiencing tremendous growth." Defendant Hynes likewise aggressively promoted XL Hybrids' prospects in a November 16, 2020 webinar hosted by IPO Edge and a November 23, 2020 interview with TD Ameritrade. During the November 23, 2020 interview, Hynes stated, "We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and we're really scaling up across the country."

179.    At the same time that Defendants carried out this media blitz promoting XL Hybrids and the proposed Merger, they and their advisors were preparing the required SEC filings, investor disclosures, and other legal documentation for the proposed Merger.

180.    On October 2, 2020 Pivotal filed a Registration Statement on Form S-4 with the SEC containing a preliminary prospectus supplement and proxy statement for Pivotal's annual meeting to be held later in the year, in order to register up to 100 million shares of Pivotal's stock to be issued to XL Hybrids' shareholders in connection with the proposed Merger. In the October 2, 2020 Registration Statement, Pivotal first disclosed XL's backlog of existing purchase orders, stating:

> ***As of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue.*** This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time. All XL orders are designed to meet a specified OEM vehicle

chassis (VIN level), with production and shipment coordinated to meet simultaneously via the industry standard ship-thru process. XL systems are sourced and built to exacting specifications in line with OEM production timelines and customer installation preferences, and supply is sourced to meet these timelines.

181.    Pivotal further stated, "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

182.    These statements were materially misleading because they failed to disclose the severe supply chain problems detailed *supra*, which prevented XL from timely converting backlog into revenue. As such, XL's backlog presented a misleading indicator of future performance, because Defendants lacked the supplies necessary to fill existing purchase orders within the 3 to 6 month lead time indicated by Pivotal's statement.

183.    While Defendants did provide certain risk warnings and other disclosures concerning battery supply issues, these disclosures were themselves misleading because they failed to disclose the extent to which the risks had already materialized and they understated the severity, scope and duration of the existing shortages. For example, in the Risk Factors section of the October 2, 2020 Registration Statement, Pivotal stated:

> ***Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business***.
>
> In the production of its electrified powertrain solutions, XL may experience increases in the cost or a sustained interruption in the supply or shortage of its components. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. … Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified.

184.    This statement was materially misleading, because it suggested that an interruption in supply or a shortage in components were eventualities that XL "may experience," but did not

disclose that XL was already experiencing these supply disruptions and that they were already severely impacting XL's ability to fill existing customer orders.

185.    In the October 2, 2020 Registration Statement, Pivotal also made the following disclosure concerning battery supply issues:

> Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020. ***The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020***.

186.    This partial disclosure gave investors some indication that XL had already experienced supply shortages, but the statement was also highly misleading because it only gave a small part of the story. According to former employees, XL had been experiencing severe battery shortages going back to May 2019, long before COVID-19 began to impact the global supply chain.[19] For the entire second half of 2019 and the entire first half of 2020, XL had an incredibly limited supply of batteries and was unable to fill the vast majority of customer orders. As recounted by the former employees, the principal reason that XL could not obtain batteries was because of XL's status as a "small fish" in the market and the priority that was given to larger customers by third-party battery suppliers. While Defendants claimed that XL and its suppliers had taken steps to "mitigate" the supply disruptions, Defendants failed to adequately describe the severity, the scope, and the longstanding duration of the problem. Moreover, XL's revenue forecast of $75

---

[19] Initial reports of a cluster of pneumonia cases of unknown origins in Wuhan (later to be identified as COVID-2019) did not begin to emerge until December 2019, and the COVID-19 pandemic did not start to meaningfully impact global travel and markets until February 2020. *See, e.g.*, T. Carvalho, The first 12 months of COVID-19: a timeline of immunological insights, Nature Reviews Immunology, Mar. 15, 2021, *available at* https://www.nature.com/articles/s41577-021-00522-1; AJMC Staff, A Timeline of COVID-19 Developments in 2020, American Journal of Managed Care, updated Jan. 1, 2021, *available at* https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020.

million for 2021 assumed that revenues would more than triple between 2020 and 2021, which meant that production would also need to more than triple and XL would need to obtain a much higher number of batteries to meet its revenue target. Without disclosing the long-standing nature of XL's problems in obtaining batteries and by portraying the issue as a temporary problem relating to COVID-19, Defendants' representations concerning XL's "scalable business model" and "established supply chain production capacity" were materially misleading and caused investors to materially underestimate the magnitude of the risks inherent in XL's revenue forecast.

187.    Pivotal amended its Registration Statement on November 12, 2020, December 1, 2020, and December 4, 2020. Each amended version of the Registration Statement was materially false and misleading for similar reasons as the original version filed on October 2, 2020.

188.    In its Form S-4/A dated November 12, 2020 (which amended the October 2, 2020 Registration Statement), Pivotal made two new relevant disclosures concerning the supply chain and battery supply issues. First, Pivotal stated:

> In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's primary battery test facility, halted testing of XL's HEV battery, preventing the validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a purchase order service arrangement.

> Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

189.    Second, Pivotal stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to **the resolution of battery supply issues**, increased end customer demand and increased order sizes. During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog. Based upon XL's current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million***.

190.    These statements were materially misleading for the same reasons that the statements in the October 2, 2020 Registration Statement were misleading as described *supra*. By characterizing the battery supply issues as principally due to the impact of the COVID-19 pandemic and failing to disclose the severity, scope and duration of the battery supply issues arising from XL's lack of market power and leverage in the battery market, Defendants materially misled investors as to nature and likely persistence of the problem. Worse still, the statements in the November 12, 2020 Amended Registration Statement suggested that the battery supply problem had been "resolv[ed]" and that in the absence of "any further unforeseen supply chain disruptions," XL was on track to meet its forecast of $21 million in revenue for 2020. The November 12, 2020 Amended Registration Statement also repeated the forecast of $75 million in revenue for 2021. As discussed in herein, the facts support a strong inference that by November 12, 2020, it was already clear that XL did not have access to a sufficient number of batteries to meet the 2021 revenue forecast of $75 million, and that the purportedly new and unexpected shortages that Defendants would disclose just a few months later were not "unforeseen" but merely a continuation of a long-standing supply chain problems that existed well before COVID-19.

191.     The SEC issued a notice of effectiveness for Pivotal's Registration Statement on Form S-4 as of December 8, 2020. On that date, Pivotal filed with the SEC its definitive proxy statement for the annual meeting, now scheduled to be held on December 21, 2020, and its prospectus for the issuance of up to 100 million shares of stock to XL Hybrids' shareholders in connection with the proposed Merger. The proxy statement provided that holders of record of Pivotal stock at the close of business on December 7, 2020 would be entitled to vote at the annual meeting, on matters including the proposed Merger and certain ancillary proposals necessary to complete the proposed Merger.

192.     In its December 8, 2020 definitive proxy statement and prospectus, Pivotal provided information regarding XL Hybrids' order backlog, sales pipeline, and revenue forecasts, and explained the difference between these distinct but interrelated concepts.

193.     Regarding backlog, Pivotal repeated that, "[a]s of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time."

194.     Regarding the sales pipeline, Pivotal repeated that XL Hybrids had a "a $220 million 12-month sales pipeline," and that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products."

195.     Regarding revenue forecasts, Pivotal disclosed revenue forecasts for XL Hybrids of $21 million for 2020, $75 million for 2021, $281 million for 2022, $648 million for 2023, and $1.4 billion for 2024. Pivotal further explained that "XL management reviews its sales opportunity

pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."

196.    Pivotal stated that that "XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance," and, similarly, that "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

       **F.    Completion of the Merger Between Pivotal and XL Hybrids**

197.    On December 21, 2020, Pivotal held its annual meeting as planned, and Pivotal shareholders voted to approve the proposed Merger and ancillary proposals necessary to complete the proposed Merger.

198.    As a result of these shareholder approvals, on December 21, 2020, XL Hybrids merged with a wholly-owned subsidiary of Pivotal. The outstanding securities of XL Hybrids were converted into securities of Pivotal. And Pivotal changed its name to XL Fleet Corp.

199.    Pivotal directors Epstein and Adams resigned effective December 21, 2020, and Defendant Kazarinoff, Defendant Hynes, Defendant Frodl, Defendant Flanagan, Defendant Griffin, Christopher Hayes, Defendant Ledecky, Niharika Ramdev, and Defendant Sclarsic were appointed to serve as directors on the board of directors of XL Fleet Corp. The board appointed Defendant Kazarinoff as CEO, Principal Financial Officer and Principal Accounting Officer, and appointed Defendant Hynes as President. Defendants Ledecky and Brady resigned as officers of Pivotal.

200.    Also on December 21, 2020, certain investors purchased shares of Pivotal/XL Fleet Corp. for gross proceeds totaling $150 million in a private placement.

201.    On December 21, 2020 Pivotal's Units automatically separated into their

component stock and warrant securities. On December 22, 2020 Pivotal's stock and warrants ceased trading on the NYSE under the PIC and PIC WS ticker symbols, and began trading as XL and XL WS, respectively.

202.    Following the completion of the merger, XL Fleet Corp. reported that Defendant Ledecky beneficially owned 7.3% of its common stock, Defendant Griffin beneficially owned 7.7%, Defendant Hynes beneficially owned 5.6%, and Defendant Kazarinoff beneficially owned 1.0%, making these individuals among XL Fleet Corp.'s largest shareholders.

203.    On December 22, 2020 XL Fleet Corp. issued a press release announcing the completion of the merger. The press release stated that XL Fleet received approximately $350 million in cash proceeds in connection with the merger, and touted the Company's technology, customer base, and future growth prospects. The press release contained a hyperlink through which readers could watch video of XL Fleet's leadership celebrating completion of the merger by ringing the opening bell at the New York Stock Exchange on the morning of December 23, 2020.

**G.    Following the Merger, Defendants Continued to Make Misleading Positive Statements about XL's Business**

204.    After the completion of the Business Combination between Pivotal and XL Hybrids, Defendants continued to aggressively and misleading tout XL Fleet's business.

205.    As XL Hybrids had done leading up to the merger, XL Fleet continued issuing numerous press releases, publishing at least nine in January and February of 2021 alone. Each of these press releases described XL as follows, or in substantially similar terms:

> XL Fleet is a leading provider of vehicle electrification solutions for commercial and municipal fleets in North America, with more than 145 million miles driven by customers such as The Coca-Cola Company, Verizon, Yale University and the City of Boston. XL Fleet's hybrid and plug-in hybrid electric drive systems can increase fuel economy up to 25-50 percent and reduce carbon dioxide emissions up to 20-33 percent, decreasing operating costs and meeting sustainability goals while enhancing fleet operations. XL Fleet's plug-in hybrid electric drive system was

named one of TIME magazine's best inventions of 2019.

206.    For example, XL Fleet issued press releases on February 4, 2021 ("XL Fleet
Partnering with Curbtender to Develop All-Electric and Plug-in Hybrid Refuse Trucks"), and
February 25, 2021 ("XL Fleet Becomes Electric Transportation Partner of UBS Arena and the
New York Islanders, Plans to Deploy 1,000 EV Charging Stations").

207.    Once again, the press releases were accompanied by frequent media appearances
from Company leadership. For example, on December 23, 2020 Defendant Hynes gave an
interview to CNBC's Squawk on the Street television program. When asked about XL Fleet's
revenue forecasts, Defendant Hynes emphasized the Company's "great pipeline" and "tremendous
interest from customers" in a "trillion dollar global industry," and that XL was "shipping hundreds
of units per month," before concluding that "we're in a great position to … really expand with the
market which clearly has a lot of demand."

208.    XL Fleet announced that members of its executive leadership team including
Defendants Hynes and Kazarinoff would participate in investor conferences including the FORCE
Family Office & Roth Capital Partners EV Symposium on Friday, January 8, 2021, the 23rd
Annual Needham Growth Conference on Wednesday, January 13, 2021, the Northland Securities
SPAC Investor Conference on Tuesday, January 19, 2021, and the BTIG Energy Transition EV
Day on February 23, 2021.

209.    Defendant Hynes appeared on the CNBC television program Mad Money with Jim
Cramer on March 2, 2021 to further promote XL Fleet's previously announced plans to partner
with UBS Arena and the New York Islanders professional hockey team with respect to electric
vehicle charging stations, and he once again touted XL Fleet's technology.

210.    Amidst Defendants' continued media blitz following the completion of the

Business Combination, Defendants and their advisors prepared additional SEC filings, investor disclosures, and other legal documentation, necessitated by the recently completed Business Combination and private placement.

211.    On January 14, 2021 XL Fleet filed with the SEC a Registration Statement on Form S-1 and preliminary prospectus, to register 55.8 million shares of common stock and 4.2 million warrants. The securities to be registered related to (i) XL shares issuable on the exercise of warrants issued by Pivotal at the time of its July 2019 IPO, (ii) XL warrants issued in the December 2020 private placement, and (iii) XL shares issued or issuable in connection with the December 2020 Business Combination to private placement investors, XL Hybrids' directors and officers, and private placement investors.

212.    The January 14, 2021 Registration Statement repeated much of the information regarding XL's business contained in Pivotal's October 2, 2020 Registration Statement on Form S-4 (as amended), and was materially false and misleading for similar reasons. The January 14, 2021 Registration Statement continued to misleadingly tout XL's business prospects, for example, stating that "[w]e are one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so we have established significant experience, data and relationships enabling scalable production, supply chain and service compared to competitors with relatively few systems in operation. We also have established global customers and suppliers."

213.    On January 22, 2021 XL Fleet filed a prospectus, which formed part of its Form S-1 Registration Statement, which the SEC declared effective that day. This prospectus was materially false and misleading for similar reasons as the Registration Statement filed on January 14, 2021.

214.    On February 26, 2020 XL Fleet's board of directors voted to approve large salary and target bonus increases for Defendants Kazarinoff and Hynes, based in substantial part on their 2020 performance. Kazarinoff's 2021 base salary was increased to $440,000, representing 150% of his 2020 base salary of $292,500. Kazarinoff's 2021 target bonus would be 70% of his (now greatly increased) base salary, as compared to the previous 30%. Hynes's 2021 base salary was increased to $372,500, representing 165% of his 2020 base salary of $225,000. Hynes's 2021 target bonus would be 50% of his base salary (*i.e.*, $186,250), more than double his 2020 target bonus of $80,000.

**H.    The Truth Emerges**

215.    On March 3, 2021 Muddy Waters published a report titled "XL Fleet Corp (NYSE XL): More SPAC Trash." The report contained a number of revelations exposing Defendants' fraud, based on interviews with former XL employees.

216.    For instance, the Muddy Waters report quoted a person it identified as Former XL Employee A, as stating "I was paid to lie. I was paid to falsify and exaggerate my pipeline," and quoted a Former XL Employee B as stating that she was instructed to record million-dollar sales opportunities for customers who had no interest in XL's products.

217.    Muddy Waters reported that XL was plagued by undisclosed supply chain failures, including an inability to procure the batteries that were vital components of all XL products, and without which XL could not deliver its products to customers. Muddy Waters quoted Former XL Employee A as stating that XL received almost zero batteries during 2019, and only a small number during the first half of 2020.

218.    Muddy Waters also revealed that at least 18 of 33 high profile "customers" touted by XL in investor presentations had not ordered any XL products from at least 2019 through the

first half of 2020, and that only 10% of XL customers placed follow-up orders due to disappointment with the actual results delivered by XL's over-hyped and misleadingly exaggerated technology.

219.    Muddy Waters exposed XL's falsification of customer mileage gains and return on investment, as XL had advertised to prospective customers and in investor presentations. While XL claimed that customers experienced gains of approximately 25% in miles per gallon with XL's hybrid product, Muddy Waters quoted former XL employees as stating that this figure was based on testing conditions designed to maximize MPG, and that in real world conditions customers usually experienced only 5-10% MPG improvement. Muddy Waters similarly revealed that although XL advertised a 55.7% ROI for customers, this was based on falsified MPG savings and other inputs, and that customers often experienced zero or negative ROI with XL products.

220.    And Muddy Waters reported that former XL employees "literally laughed out loud at XL's revenue projections."

221.    Following publication of the Muddy Waters report, on March 3, 2021 XL's stock closed at $13.86 per share, 13.1% lower as compared to the prior day, on exceptionally high trading volume.

222.    On March 4, 2021 XL published a press release titled "XL Fleet Responds to Recent Short-Seller Report," in which the entirety of the Company's rebuttal of the highly detailed and incriminating Muddy Waters report was to say "[t]he report contains numerous factual inaccuracies, misleading statements, and flawed conclusions. The Company intends to respond in due course."

223.    Following XL's exceptionally weak response to the Muddy Waters report, on March 4, 2021 XL's stock closed at $12.00 per share, down 13.4% as compared to the prior day,

on unusually high trading volume. On Friday March 5, 2021, XL's stock price continued to fall, closing at $11.17 per share, down 6.9% as compared to the prior day, again on unusually high trading volume.

224.    On the next trading day, Monday March 8, 2021 XL finally issued its promised rebuttal to the Muddy Waters report, in a press release titled "XL Fleet Refutes Grossly Inaccurate and Misinformed Report by Short-Seller." While this press release generally promoted XL's business and vaguely cast aspersions on the Muddy Waters report, it entirely failed to respond to many of Muddy Waters' core allegations.

225.    For example, while faulting Muddy Waters for confusing the terms "backlog" and "pipeline," XL did not deny that its pipeline numbers were falsely exaggerated. XL failed to dispute Muddy Waters' battery supply chain allegations, and in fact implicitly confirmed them by stating that in 2019 XL was "impacted by a component shortage that affected battery supply." XL did not deny that any of the 18 of the 33 customers featured in its investor presentation were inactive. While XL quibbled with Muddy Waters' MPG allegations, it effectively conceded that real-world results lagged the advertised 25% improvement, by providing excuses such as "as with any motor vehicle, actual customer MPG performance heavily depends on a range of factors related to how the vehicle is used."

226.    Following XL's still exceptionally weak response to the Muddy Waters report, on March 8, 2021 XL's stock closed at $10.48 per share, down 6.2% as compared to the prior day, on high trading volume.

227.    On March 10, 2021 Muddy Waters published a follow-up report titled "XL Fleet: Not Denying Much, Still SPAC Trash," pointing out the XL had failed to deny many of the key allegations from Muddy Waters' initial March 3, 2021 report.

228.    XL has never issued any further rebuttal of the March 3, 2021 Muddy Waters report, or any response to the March 10, 2021 Muddy Waters follow-up report.

229.    Independent market observers viewed Muddy Waters' allegations as credible and tied to the substantial declines in XL's stock price.

230.    Reuters published an article on March 3, 2021, titled "XL Fleet shares tumble after Muddy Waters takes short position." The article noted that shares had fallen as much as 19.5% that day, and that Muddy Waters claimed the Company had "significantly exaggerated its order backlog, that the return on investment for its products was likely negative, and that it would not be able to compete with big car makers on electrification."

231.    The following day, March 4, 2021, Business Insider published an article titled "XL slumps 205 as famed investor Carson Block goes short, says the market is in a SPAC bubble full of 'garbage.'" The article stated that "Block alleged XL Fleet was misleading investors with an inflated sales backlog." Carson Block is the founder and principal of Muddy Waters.

232.    XL itself later admitted that the fall in its publicly traded stock price was caused by the Muddy Waters Report. For example XL stated in its 2020 annual report on Form 10-K that "[i]n March 2021, an entity published an article containing certain allegations against us. This article and the public response to such article, as well as other negative publicity, have adversely affected our brand and reputation as well as our stock price," and that "in March 2021, an entity published an article containing certain allegations against us that we believe has negatively impacted the trading price of our Common Stock."

233.    On March 31, 2021, after the close of trading, XL Fleet announced its fourth quarter 2020 and full year 2020 financial results, issuing a press release, and filing a current report on Form 8-K and an annual report on Form 10-K with the SEC. In addition, on March 31, 2021, the

XL Fleet management team held a public conference call to discuss these results with investors.

234.    Defendants reported $10.9 million in fourth quarter 2020 revenue, and $20.3 million in full-year 2020 revenue. As XL Fleet admitted in its annual report, much of this revenue was attributable to belatedly filling orders previously delayed and backlogged due to a lack of battery supplies, stating that "[o]f the $20.3 million in revenue for the year ended December 31, 2020, approximately $17.2 million of revenue was recognized during the second half of the year, which was primarily due to the resolution of battery supply issues and seasonality in the order and delivery of fleet vehicles," and that "[r]esolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog."

235.    Although Defendants had recently forecast $75 million in 2021 revenue, XL announced that it now expected first quarter revenue of only $1 million, and stated that it would no longer provide full-year 2021 revenue guidance. Although Defendants had recently hyped XL Fleet's purportedly dramatic growth prospects, they admitted in the press release that the $1 million of first quarter 2021 revenue guidance as "roughly flat versus the prior year quarter."

236.    Defendants attempted to deflect blame for this dramatic about-face by making excuses in their press release, quoting Defendant Kazarinoff as stating:

> "The world is electrifying – however, economies and businesses around the world continue to face ongoing impacts of the COVID-19 pandemic. As a result, we continue to experience significant friction including OEM delays amid microchip and other shortages, and currently forecast first quarter 2021 revenue of approximately $1 million, or roughly flat versus the prior year quarter."

> "Given this ongoing uncertainty and the potential for extended industry-wide issues, combined with typical seasonal patterns in our orders and a significant majority of revenues focused on the second half as in prior years, we are not currently providing formal full-year 2021 financial guidance. As these pressures abate, we expect to see a stronger market environment emerge later this year. In this scenario, we would expect to realize significant revenue growth in 2021, accompanied by even more pronounced seasonality and therefore weighting to the second half of the year."

237.    On XL Fleet's March 31, 2021 earnings call, Canaccord Genuity analyst Jed

Dorsheimer questioned the severe drop off in projected revenues:

> I'm trying to reconcile the 90% drop in revenues Q4 to Q1. Could you maybe help
> with the backlog? Because backlog shouldn't be affected. And if I look at the
> shortages from a chip perspective, I'm not seeing a drop that significant in terms of
> industry numbers. So . . . were things pulled into Q4 [2020] or are they just being
> pushed out into Q3 [2021]?

In response, Defendants Kazarinoff and Hynes essentially dodged these questions, while

deflecting blame onto the COVID pandemic and seasonal ordering patterns. Dorsheimer

responded, implicitly noting that the drop-off in revenues was inconsistent with the tremendous

growth recently touted by Defendants, "I just think that from a seasonality perspective, the

expectation is that this is more of a growth story than a value story. And that's why – that's

where my questions were coming from."

238.    On April 1, 2021, Canaccord Genuity issued a report lowering its price target for

XL Fleet from $30 to $10 "to reflect the lack of 2021 visibility." The report stated that "XL

provided guidance for Q1 sales of $1M, versus consensus expectations of $7.9M. The company

attributes the shortfall to the auto industry's chip shortage and COVID-19 headwinds. Given this

is the company's first quarter as a public company, this comes as a major disappointment."

239.    The shockingly weak first quarter 2021 revenue guidance now provided by

Defendants, and the withdrawal of XL's recently issued revenue forecast of $75 million for the

full-year 2021, were direct results of, and further revealed the truth regarding, XL's falsely inflated

pipeline, backlog, and revenue forecasts, and also represented the materialization of risks

previously concealed by Defendants' false statements.

240.    Following XL's release of fourth quarter and full-year 2020 earnings after the close

of trading on March 31, 2021, on April 1, 2021 XL's stock closed at $7.89 per share, 12.1% lower

as compared to the prior day, on exceptionally high trading volume.

241.    Independent market observers interpreted the disappointing 2020 results and the withdrawal of XL Fleet's 2021 guidance as effectively a confirmation of the allegations of the Muddy Waters Report. For example, On April 8, 2021, Mad Money host Jim Cramer was asked by a caller how he "feel[s] about the Company XL Fleet." Cramer responded, "they came on here, they told a decent story, but right after a guy [who] does a lot of good work, Carson Block, said that this thing was not a good stock and that you should sell and then they proceeded to not do well. And so I have to tell you when a short seller says things are going to happen and then the things happen, well it makes me say let's stay away."

242.    Similarly, independent market observers continued to note XL's failure to deny the majority of Muddy Waters' allegations. On April 27, 2021 Mr. Cramer stated on his show, "[t]he short report about it was difficult and I'd like to have XL back to answer the short report, otherwise I can't recommend it."

## VIII.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

243.    The Relevant Period begins on September 18, 2020 when the Company announced the Merger Agreement had been entered into by and among Pivotal, Merger Sub, and XL Hybrids. On that day, Pivotal and XL Hybrids jointly issued a press release. This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.

244.    The September 18, 2020 press release stated that XL's "rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion[.]" The press release also stated, "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75

million in 2021." The press release also stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University." Ledecky was quoted in the press release as stating, "XL's revenues are expected to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles."

245.    The statements above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (i)XL's reported sales pipeline of $220 million was materially overstated, as detailed *supra*; (ii) XL had been experiencing supply chain problems that impeded its ability to timely fill existing orders, as detailed *supra*; (iii) XL's customers had low reorder rates, and its customer base was overstated because a large number of the customers touted by XL were inactive, as detailed *supra*; (iv) the quality and benefits of XL's technology were overstated and that technology did not provide the MPG savings or ROI that XL represented to its customers, as detailed *supra*; (v) XL's revenue forecasts lacked a reasonable basis, omitted facts tending to seriously undermine the accuracy of the projections, and were materially overstated for the reasons set forth *supra*; and (vi) As a result of the foregoing omissions, the challenged statements presented a materially misleading impression of XL Fleet's financial prospects, growth potential, and risk profile.

246.    In addition, the above statements were materially false and/or misleading when made because: (i) XL's technology was not "rapidly deployable" in light of XL's supply chain problems detailed *supra*; (ii) XL's technology did not "position" XL for "long-term growth" because XL had materially overstated its technology's capabilities when in fact this technology

produced weak results and led to substantial customer attrition, as detailed *supra*; and (c) The list of significant customers in the press release was misleading in light of the fact that several of the most prominent customers (including FedEx, The Coca-Cola Company, PepsiCo, and Verizon) were inactive and no longer ordering XL products, as detailed *supra*.

247.    On September 18, 2020, the Company also held a conference call (the "September 18, 2020 Call") to discuss the Merger. A transcript of the call was attached as Exhibit 99.3 to a Form 8-K signed by Ledecky and filed with the SEC by Pivotal on September 18, 2020. On the September 18, 2020 Call, Kazarinoff stated:

> We are proud of our differentiated position, with more units sold and more models available to meet customer needs. We have more than 3,200 units on the road today and are experiencing great momentum. ***We are shipping hundreds of additional units every month, putting us on target to deploy more than 4,000 systems by year-end and almost 10,000 units by the end of 2021***. Additionally, our 9 available models today means we are more than double our closest competitor in offering the optionality and customization that the customer base really requires. Together with our ***scaled production capacity and significant customer base***, we believe this establishes our leadership position in the market and a ***de-risked path to electrification***.
>
> *        *        *
>
> ***We have a 12-month rolling sales pipeline of more than 220 million dollars in potential new business opportunities***, and we are on target to triple our 2020 revenues versus last year. More importantly from our perspective is the growth we've been realizing in average order size, with our largest order in 2020 growing by more than 3x versus last year. This is reflective of what we refer to as a transition from trial to adoption. Traditionally, this is a very conservative industry – only adopting new technology after it's been proven and is trusted, and we believe our order momentum is indicative of this transition for us and our customers.

248.    On the September 18, 2020 Call, Kazarinoff touted the Company's ability to increase its production capacity in very little time and claimed this would allow XL Fleet to "scale at a rapid pace" to achieve "revenue up to approximately 1.5 billion dollars by 2024":

> Through our approach, ***we can significantly increase our own production capacity in very little time***. For example, we can obtain an additional 10,000 units of capacity

for less than 500 thousand dollars in about 6 months – and we can get up to 100,000 units of capacity for under 5 million dollars in less than 18 months. This is tremendous leverage, ***allows us to scale at a rapid pace***, and differentiates us versus the competition.… ***We forecast to scale our revenue up to approximately 1.5 billion dollars by 2024***, which reflects approximately 6 percent of the total market.

249.    Hynes stated on September 18, 2020 Call, "We have intentionally developed a very scalable, asset-light business model that leverages the existing installation capacity of the industry and provides maximum flexibility to our continued growth. Overall, we believe this positions us as a lower-risk path to electrification, providing electrification-as-a-service to our customers as we deliver reliability, sustainability and financial returns."

250.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

251.    In addition, the above statements were materially false and/or misleading when made because: (i) The representations that XL's business model was "very scalable" and that XL could "scale at a rapid pace" was materially false and misleading due to XL's severe supply chain problems, as detailed *supra*, which prevented XL from significantly increasing its production capacity in a short period of time; and (ii) The representation that XL faced a "de-risked path to electrification" misleadingly omitted the significant risks that XL faced concerning its supply chain, inactive customers, and the quality and reliability of its technology as detailed *supra*.

252.    On September 18, 2020, the Company also issued an Investor Presentation which was attached as Exhibit 99.2 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.[20] The September 18, 2020 Investor Presentation stated that XL had a "Broad portfolio of established, proven, cost-effective solutions for numerous classes/segments with rapid

---

[20] As indicated in the December 8, 2020 Proxy/Prospectus, the September 18, 2020 Investor Presentation was discussed and finalized by both Pivotal and XL Hybrids.

product development capabilities" and its "Established production can scale to 100,000+ units annually and XL's capital efficient operating model is ready to scale and drive profitably."

253.    The September 18, 2020 Investor Presentation stated that XL's "Power Train Platform Is Proven, Flexible and Scalable" and emphasized that its platform allowed:

> Unique rapid integration of hardware and software
> - <1 month to integrate new OEM battery into vehicles
> - <3 months to production (including crash testing)
> Quickly scaling across vehicle classes, OEM platforms and applications
> - <1 month to develop HEV for new OEM chassis
> - <6 months to production

254.    The Investor Presentation also stated that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."

255.    The September 18, 2020 Investor Presentation provided the Company's financial projections for each year from 2020 through 2024, when it projected revenue reaching approximately $1.4 billion. The presentation also touted 33 purported "customers" of XL while emphasizing XL's supposed sales pipeline of $220 million, while also touting MPG gains of approximately 25% for XL hybrid, and up to 50% for XL plug-in.

256.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

257.    On September 18, 2020, Hynes was interviewed on CNBC's Squawk Box. A transcript of this interview was filed as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed by Pivotal with the SEC on September 21, 2020. During the interview, Hynes stated that XL's "established supply chain production capacity" would enable it to scale and reach $75 million in revenue in 2021:

We're growing at 3X this year. ***We'll do over 75 million in revenue next year***.... So, you know, we have the ***established supply chain production capacity***, we have a very low risk and low cost production process compared to other companies in the industry. So, we don't have to invest hundreds of millions or billions of dollars into factories. ***We're actually leveraging the existing production infrastructure and enabling us to scale*** without huge amounts of capital to build out that capacity.

258.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

259.    On September 21, 2020, the Company filed with the SEC an Updated Investor Presentation as attachment 99.2 to a Form 8-K signed by Ledecky repeating the misstatements *supra*.

260.    The September 21, 2020 Updated Investor Presentation also added a new slide representing that customers could obtain a 55.7% return on investment, as detailed in the slide copied below:



261.    The above statements were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed

to disclose, among other things, the adverse facts ser forth *supra*.

262.     On October 2, 2020 Pivotal filed a registration statement on Form S-4 with the SEC

signed by Ledecky, Brady, and each member of Pivotal's board of directors (including Griffin),

seeking shareholder approval of the Merger.

263.     The October 2, 2020 Registration Statement claimed XL had "a backlog of 961

firm purchase order representing $12.3M in revenue," that XL's customers make purchases "with

a typical 3 to 6 month lead time" and that "supply is sourced to meet these timelines":

> ***As of September 25, 2020, XL has a backlog of 961 firm purchase orders
> representing $12.3M in revenue***. This backlog reflects the manner in which XL
> believes its customers currently purchase commercial vehicles, with a typical ***3 to
> 6 month lead time***. All XL orders are designed to meet a specified OEM vehicle
> chassis (VIN Level), with production and shipment coordinated to meet
> simultaneously via the industry standard ship-thru process. XL systems are sourced
> and built to exacting specifications in line with OEM production timelines and
> customer installation preferences, and ***supply is sourced to meet these timelines***.

264.     The October 2, 2020 Registration Statement also stated that the Company's "sales

opportunity pipeline and committed backlog are important indicators of future performance":

> Key factors affecting XL's operating results include its ability to increase sales of
> its current product offerings and expand its product offerings in the future and
> customer demand for such product offerings. ***XL believes that the size of its sales
> opportunity pipeline and committed backlog are important indicators of future
> performance***.

265.     The statements above were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed

to disclose, among other things, the adverse facts set forth *supra*. In addition, the above statements

were materially false and/or misleading when made because: (i) Backlog presented a misleading

indicator of future performance due to XL's severe supply shortages, which prevented XL from

timely converting backlog into revenue, as detailed *supra*; and (ii) XL lacked the supplies

necessary to fill existing purchase orders within the "3 to 6 month lead time" that XL represented to be "typical."

266.    In the Risk Factors section of the October 2, 2020 Registration Statement, the Company warned that harm to XL's business that could be caused by supply disruptions and potential shortages of XL's components:

> ***Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business***.
>
> In the production of its electrified powertrain solutions, XL may experience increases in the cost or a sustained interruption in the supply or shortage of its components. Any such increase ***or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results***. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. For instance, XL is exposed to multiple risks relating to price fluctuations for battery cells. These risks include:
>
> - the inability or unwillingness of current battery manufacturers to build or operate battery cell production facilities to supply the numbers of battery cells required to support the growth of the electric vehicle industry as demand for such cells increases;
> - disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and
> - an increase in the cost of raw materials.
>
> Any disruption in the supply of battery cells **could** temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified. Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, fluctuations or shortages in petroleum and other economic conditions may cause XL to experience significant increases in freight charges. Substantial increases in the prices for raw materials may increase the cost of XL's components and consequently, the costs of products. There can be no assurance that XL will be able to recoup increasing costs of its components by increasing prices, which could reduce its margins.

267.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were

materially false and/or misleading when made because: (i) The risk warnings presented as mere hypothetical risks adverse events that had already materialized; and (ii) The risk warnings failed to disclose specific facts concerning XL's pre-existing shortages and supply problems that were necessary for investors to understand the magnitude of the risks at issue.

268.    The October 2, 2020 Registration Statement also stated that XL and its suppliers and OEMs had made improvements in XL's supply chain during the second half of 2020 that XL believed would "mitigate the supply disruptions experienced during the first half of 2020" due to the COVID-19 pandemic:

> Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020. ***The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020***.

269.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were materially false and/or misleading when made because: (i) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019; (ii) The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID; (iii) The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and (iv) The statements failed to disclose that XL's "mitigation" efforts were insufficient to secure enough batteries for the massive expansion of production that

was contemplated by XL's revenue forecasts for 2021.

270.    The October 2, 2020 Registration Statement claimed its relationships "enabl[ed] scalable production, supply chain and service compared to competitors" and touted its "established global customers and suppliers":

> XL is one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so XL has established significant experience, data and relationships ***enabling scalable production, supply chain and service compared to competitors*** with relatively few systems in operation. XL also has ***established global customers and suppliers***.

271.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

272.    The October 2, 2020 Registration Statement noted the environmental standards that XL was subject to and stated that "violations may also result in the suspension or revocation of permits and licenses":

> Environmental standards applicable to XL are established by the laws and regulations of the countries in which it operates, standards adopted by regulatory agencies and the permits and licenses that it holds. Each of these sources is subject to periodic modifications and increasingly stringent requirements. Violations of these laws, regulations or permits and licenses may result in substantial civil and criminal fines, penalties, orders to cease the violating operations or to conduct or pay for corrective works. In some instances, ***violations may also result in the suspension or revocation of permits and licenses***.

273.    The October 2, 2020 Registration Statement stated that XL's systems are fitted to vehicles that have been certified to meet the requirements of the California Air Resources Board ("CARB") and that XL had obtained the requisite Executive Orders ("EOs") for prior model years and was in the process of EOs for future products. Specifically, the October 2, 2020 Registration Statement stated:

> ***CARB Emissions Compliance and Certification***

84

The XL hybrid and plug-in hybrid systems are fitted to vehicles that have been certified to meet the requirements of U.S. Environmental Protection Agency (the "EPA") and California Air Resource Board ("CARB"). The OEMs are responsible for ensuring compliance with the appropriate regulations for the base vehicle for emissions, fuel economy and on board diagnostics.

CARB classifies the XL system as an aftermarket fit system / device. As such, CARB requires that an Executive Order ("EO") is obtained for the sale of the system intended for use on a vehicle to be operated in the state of California. In order to obtain the EO, XL is required to submit an application to CARB for each vehicle group or family, which is required for each model year. The vehicle models included in a group or family are determined by the level of commonality of vehicle systems on both the base vehicle and the hybrid or plug in hybrid systems that are fitted.

\*       \*       \*

***XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be introduced into the Californian market***. EOs issued by CARB to XL are public record and are available to view on the CARB database for aftermarket, performance, and add-on parts. EOs also include requirements to collect data from vehicles in the field (in use data).

274.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that: (i) XL had lost its CARB certification in 2019 and had been unable to secure re-approval in 2020, so XL could not sell its products in California; (ii) The risk warning concerning the potential revocation of permits or licenses presented as mere hypothetical risks adverse events that had already materialized; and (iii) The inclusion of California sales opportunities in XL's sales pipeline, when XL was not permitted to sell its products in California, resulted in an artificial inflation of the pipeline and the revenue forecasts based on those pipeline figures, as detailed *supra*.

275.    The October 2, 2020 Registration Statement touted the purported mileage gains resulting from use of XL's products:

XL's hybrid systems (branded as "XLH™") have been proven to **improve MPG by up to 25%** over standard gas-powered vehicles, while reducing CO2 emissions by up to 20%. Its plug-in hybrid system, branded as "XL Plug-In™" or "XLP™, was named one of TIME magazine's The 100 Best Inventions of 2019. It offers an even more significant improvement in these metrics, demonstrating **up to a 50% MPG improvement** and up to a 33% reduction in emissions.

276.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

277.    The October 2, 2020 Registration Statement stated that in the judgment of Pivotal's board of directors, XL's value was at least 80% of the assets held in Pivotal's trust account. While acknowledging that Pivotal's board did not obtain a third-party valuation of XL, the Registration Statement emphasized the "significant due diligence" conducted by Pivotal's board and concluded that the business experience of Pivotal's directors entitled them to conclude that the transaction was fair to Pivotal's stockholders and the 80% test was satisfied:

> **Pivotal's board of directors did not obtain a third-party valuation or fairness opinion** in connection with its determination to approve the Business Combination. Accordingly, investors will be relying solely on the judgment of Pivotal's board of directors in valuing XL and assuming the risk that the Pivotal board may not have properly valued the business. **However, Pivotal's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, Pivotal's board of directors conducted significant due diligence on XL. Based on the foregoing, Pivotal's board of directors concluded** that its members' collective experience and backgrounds, together with the experience and sector expertise of Pivotal's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination, including **that the Business Combination was fair from a financial perspective to its stockholders and that XL's fair market value was at least 80% of the assets held in the trust account** (excluding the deferred underwriting commissions and taxes payable on interest earned on the trust account) at the time of the agreement to enter into the Business Combination. There can be no assurance, however, that Pivotal's board of directors was correct in its assessment of the Business Combination.

*         *         *

After consideration of the factors identified and discussed in the section entitled "The Business Combination Proposal—Pivotal's Board of Directors' Reasons for Approval of the Business Combination," Pivotal's board of directors concluded that the Merger met all of the requirements disclosed in the prospectus for Pivotal's initial public offering, including that XL has a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the amount of deferred underwriting commissions held in trust) at the time of the execution of the Merger Agreement.

278.     In addition, the October 2, 2020 Registration Statement stated:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of incorporation that any business acquired by Pivotal have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for an initial business combination. ***Based on the financial information used to approve the Business Combination described herein, Pivotal's assessment that XL's valuation was attractive compared to its competitive peers and the other information described herein, Pivotal's board of directors determined that this requirement was met***. In reaching this determination, Pivotal's board of directors concluded that it was appropriate to base such valuation on a number of qualitative factors, such as management strength and depth, competitive positioning, customer relationships and technical skills, as well as quantitative factors, such as the historical performance of XL and ***the potential for future growth in revenues*** and profits of XL, rather than rely on any one factor. Pivotal's board of directors believes that the financial skills and background of its members qualify it to conclude that the acquisition met the 80% requirement.

*          *          *

**Recommendation of Pivotal's Board of Directors**

After careful consideration of the matters described above, particularly XL's position in its industry, potential for growth and profitability, the experience of XL's management and XL's competitive positioning, its customer relationships and technical skills, ***Pivotal's board determined unanimously that each of the business combination proposal and the other proposals to be presented at the annual meeting are fair to and in the best interest of Pivotal's stockholders*** …. Pivotal's board of directors has approved and declared advisable and unanimously recommend that you vote or give instructions to vote "FOR" each of these proposals and "FOR" each of nine director nominees identified in this proxy statement/prospectus to serve as directors of the combined company.

279.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (i) XL's value was not equal to at least 80% of the balance of funds in Pivotal's trust account, for all of the reasons set forth in herein; (ii) For the same reasons, the proposed business combination was not in the best interests of Pivotal's stockholders; (iii) The determinations by Pivotal's board of directors concerning XL's valuation and the fairness of the transaction lacked a reasonable basis, because Pivotal's directors either knew the adverse facts or would have known those facts had they engaged in the extensive due diligence that they claimed they conducted; and (iv) For the additional reasons set forth in *infra*, Pivotal's directors, including Ledecky and Griffin, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

280.    The October 2, 2020 Registration Statement claimed that XL's management believed that the assumptions and estimates on which the XL's revenue forecast was based were reasonable and based on the best then-currently available information:

> Although the assumptions and estimates on which the forecasts for revenue and costs are based are believed by XL's management to be ***reasonable and based on the best then-currently available information***, the financial forecasts are forward-looking statements that are based on assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond XL's control.

281.    The October 2, 2020 Registration Statement incorporated XL management's forecast that XL would achieve revenues of approximately $21 million in 2020 and revenues of approximately $75 million in 2021. The Registration Statement also claimed that XL's management prepared its projections on a "reasonable basis" which "reflects the best currently available estimates and judgments":

XL does not as a matter of course make public projections as to future sales, earnings or other results. However, XL's management has prepared the prospective financial information set forth below to present the key elements of the forecasts provided to Pivotal. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of XL's management, ***was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief***, the expected course of action and the expected future financial performance of XL.

*     *     *

The key elements of the forecasts provided to Pivotal, which assumes accelerating sales of XL's existing Class 2-6 hybrid electric vehicle and plug-in hybrid electric vehicle solutions bolstered by the commencement of sales of XL's all-electric solutions for Class 4-6 vehicles and xEV solutions for Class 7-8 vehicles in 2022, are summarized in the table below:

*Key Financial Metrics:*

|  | Forecast | | | | |
|  | Year Ended December 31, | | | | |
|  | 2020E | 2021E | 2022E | 2023E | 2024E |
|  | | | (in millions) | | |
| Total Revenue | $ 21 | $ 75 | $ 281 | $ 648 | $1,377 |
| Gross Profit | 2 | 17 | 69 | 158 | 340 |
| EBITDA | (10) | (15) | 31 | 117 | 308 |

282.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (i) The revenue forecasts prepared by XL management lacked a reasonable basis, for all of the reasons set forth *supra*; (ii) XL management was directly involved in the pipeline inflation scheme, as detailed *supra*; (c) XL management was aware of the supply chain disruptions and shortages, as detailed *supra*; (d) XL management was aware of low customer reorder rates and that many of the prominent customers they chose to tout had been inactive, as detailed *supra*; (e) XL management was aware that XL's technology did not provide the MPG savings or ROI to customers that XL represented, as detailed *supra*; (f) XL management was aware that XL's revenue projections lacked a reasonable basis and

were materially overstated, as detailed *supra*; and (e) For the additional reasons set forth *infra*, XL management, including Hynes, Kazarinoff, and Piern, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

283.    On October 26, 2020, Pivotal and XL issued a press release. This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on October 26, 2020. The press release stated, "The Company is revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."

284.    The above statement was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because it failed to disclose, among other things, the adverse facts set forth *supra*.

285.    On October 26, 2020, representatives of Pivotal and XL participated in a webinar hosted by SPACInsider. Pivotal attached a copy of the transcript of the webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on October 28, 2020.

286.    At the October 26, 2020 webinar, Kazarinoff stated:

*We've already got established scaled production, a scaled customer base*. So, we truly are in the lead here in North America and our position to keep that lead for years to come.

\*          \*          \*

Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and *we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue*. We are currently tripling revenue here in the middle of this pandemic, despite some of those challenges and on track for $21 million in revenue in 2020.

287.    The above statements were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

288.    At the October 26, 2020 webinar, Hynes stated that "vehicles are getting built and then shipped to the end customer, again, anywhere in the U.S. or Canada" and "We're in about every state except for Alaska at this point."

289.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that: (i) XL had lost its CARB certification in 2019 and had been unable to secure re-approval in 2020, so XL could not sell its products in California; and (ii) The inclusion of California sales opportunities in XL's sales pipeline, when XL was not permitted to sell its products in California, resulted in an artificial inflation of the pipeline and the revenue forecasts based on those pipeline figures, as detailed *supra*.

290.    Also, at the October 28, 2020 webinar, Kazarinoff stated that "we're leveraging that existing network and we can ramp-up our own preassembly and logistics operation to that 100,000 unit a year level with less than $5 million in investment in less than 18 months. So, we've already got an established business model that's very scalable."

291.    The moderator at the webinar asked how the Company was able to achieve rapid installation for a large order and Kazarinoff replied, "our network of upfitters folks we already have agreements with. They've got over a hundred locations around North America with capacity to process large numbers of vehicles." Hynes added, "we have been getting increasingly large orders from major fleet customer over the years. So this is something that we've already done and *we can definitely scale and continue to accelerate with more and more customers who are buying at this size*."

292.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

293.    On November 12, 2020, XL Fleet issued a press release announcing its third quarter 2020 financial results. This press release was also filed by Pivotal with the SEC pursuant to Rule 425 under the Securities Act of 1933 on November 12, 2020. The press release stated:

> Due to strong year-to-date results, XL remains on track to deliver on its full year 2020 revenue forecast of approximately $21 million. ***XL continues to grow its sales opportunity pipeline for 2021 to $220 million as of today, which supports XL's current revenue forecast of $75 million for fiscal year 2021***.
>
> *        *        *
>
> "Fleet electrification is a massive long-term opportunity supported by favorable market and regulatory trends and an enduring focus on the decarbonization of operations by fleet owners globally," said Tod Hynes, Founder and Chief Strategy Officer of XL. "We are committed to delivering solutions that meet our customers' sustainability objectives and reliability requirements through products and services ***available today***. Moreover, XL's strong track-record, long-term relationships, ***and established supply chain partnerships continue to provide opportunities to further scale our business and broaden our product portfolio***."

294.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

295.    On November 12, 2020, Pivotal filed an amendment to the October 2, 2020 Registration Statement on Form S-4/A with the SEC (the "November 12, 2020 Amendment), which was signed by Ledecky and Brady, and signed by Ledecky as attorney-in-fact for each member of the Pivotal board of directors (including Griffin). The November 12, 2020 Amendment reiterated the statements above. Those statements were materially false and/or misleading for the reasons stated *supra*.

296.   With respect to XL's backlog, the November 12, 2020 Amendment added the following language:

> XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections. *XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance*.

297.   The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were materially false and/or misleading when made because: (i) Backlog presented a misleading indicator of future performance due to XL's severe supply shortages, which prevented XL from timely converting backlog into revenue; and (ii) XL lacked the supplies necessary to fill existing purchase orders within the "3 to 6 month lead time" that XL represented to be "typical."

298.   With respect to battery supply, the November 12, 2020 Amendment revised the risk factor disclosure described above to state:

> *Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business*.
>
> In the production of its electrified powertrain solutions, *XL has experienced and in the future may again experience increases in the cost or a sustained interruption in the supply or shortage of its components*. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. For instance, XL is exposed to multiple risks relating to price fluctuations for battery cells. These risks include:
>
> - the inability or unwillingness of current battery manufacturers to build or operate battery cell production facilities to supply the numbers of battery cells

required to support the growth of the electric vehicle industry as demand for such cells increases;

- disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and
- an increase in the cost of raw materials.

Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified. Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, fluctuations or shortages in petroleum and other economic conditions have in the past and may again in the future cause XL to experience significant increases in freight charges. Substantial increases in the prices for raw materials have in the past and may again in the future increase the cost of XL's components and consequently, the costs of products. There can be no assurance that XL will be able to recoup increasing costs of its components by increasing prices, which could reduce its margins.

299.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the above statements were materially false and/or misleading when made because the risk warnings failed to disclose specific facts concerning XL's pre-existing shortages and supply that were necessary for investors to understand the magnitude of the risks at issue.

300.    The November 12, 2020 Amendment made two new additional disclosures concerning the supply chain and battery supply issues. First, Pivotal stated:

In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's primary battery test facility, halted testing of XL's HEV battery, preventing the validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a purchase order service arrangement.

Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply

disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

301.    The November 12, 2020 Amendment also stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the resolution of battery supply issues, increased end customer demand and increased order sizes. ***During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog***. Based upon XL's current production throughput and its current backlog of orders, and subject to any further ***unforeseen supply chain disruptions caused by the COVID-19 pandemic***, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million.

302.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were materially false and/or misleading when made because: (i) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019; (ii) The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID; (iii) The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and (iv) The statements misleadingly suggested that the battery supply issues had been "resolv[ed]" and failed to disclose that the "improvements to XL's supply

chain" were insufficient to secure enough batteries for the massive expansion of production that

was contemplated by XL's revenue forecast for 2021.

303.    With respect to the satisfaction of the test that XL's value be equal to at least 80%

of the assets in Pivotal's trust account, the November 12, 2020 Amendment revised the statement

above to state:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of
incorporation that any business acquired by Pivotal have a fair market value equal
to at least 80% of the balance of the funds in the trust account (excluding the
deferred underwriting commissions and taxes payable) at the time of the execution
of a definitive agreement for an initial business combination. The balance of the
funds in Pivotal's trust account (excluding deferred underwriting commissions and
taxes payable) at the time of the execution of the Merger Agreement with XL was
approximately $223 million. In determining whether the 80% requirement was met,
rather than relying on any one factor, Pivotal's board of directors concluded that it
was appropriate to base such valuation on a number of qualitative factors, such as
management strength and depth, competitive positioning, customer relationships
and technical skills, as well as quantitative factors, such as the anticipated implied
enterprise value of the combined company being approximately $1 billion with no
material debt expected to be outstanding, Pivotal's assessment that XL's valuation
was attractive compared to its competitive peers, the historical performance of XL
and the ***potential for future growth in revenues and profits of XL and a $220
million 12-month sales pipeline***. Based on the qualitative and quantitative
information used to approve the Business Combination described herein, Pivotal's
board of directors determined that the foregoing 80% fair market value requirement
was met. Pivotal's board of directors believes that the financial skills and
background of its members qualify it to conclude that the acquisition met the 80%
requirement.

304.    The above statements were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed

to disclose, among other things, the following adverse facts: (i) XL's value was not equal to at

least 80% of the balance of funds in Pivotal's trust account; (ii) The determination by Pivotal's

board of directors concerning XL's valuation lacked a reasonable basis, because Pivotal's directors

either knew the adverse facts or would have known those facts had they engaged in the extensive

due diligence that they claimed they conducted; and (iii) For the additional reasons set forth in *infra*, Pivotal's directors, including Ledecky and Griffin, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

305.     On November 16, 2020, XL Fleet issued a press release entitled "XL Fleet Expands XLP™ Plug-in Hybrid Electric Drive System For Use in Multiple GM Fleet Applications." This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC by Pivotal on November 16, 2020. Therein, the Company claimed it was able to "immediately serve this market":

> "Companies and municipalities are focused on electrifying a larger percentage of their fleets, while ensuring they uphold their performance and operational requirements," said Tod Hynes, Founder and Chief Strategy Officer of XL Fleet. "XL's ability to electrify a wide range of commercial applications from the world's leading vehicle manufacturers allows us to immediately serve this market with proven, high performance vehicles that are already designed and specified for the rigorous duty cycles of fleets."

306.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

307.     On November 16, 2020, Hynes participated in a webinar hosted by IPO Edge. On November 19, 2020, the Company attached a copy of the transcript of that webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC. Hynes stated at the webinar, "We have a very low cost and highly scalable production capacity that leverages the existing manufacturing capacity of the industry. So our systems get installed as the vehicles are manufactured and then shipped anywhere in the country and end up as brand new vehicles at the customer's location."

308.     The above statements were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

309.   On November 23, 2020, Defendant Hynes participated in an interview with TD Ameritrade. On November 27, 2020, Pivotal attached a copy of the transcript of that interview as Exhibit 99.1 to a Form 8-K, which was signed by Ledecky and filed with the SEC. Hynes stated during the interview:

> We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and we're really scaling up across the country and have a very low cost installation structure compared to others in the market who are trying to bring new products in.
>
> \*      \*      \*
>
> So we're very excited, ***we're in a great position***. Again, we are a first mover; we have gotten great feedback from our customers and our installation partners. ***Other major players in the industry for example, batteries supply, we now have multiple battery suppliers for our technology***. So it is really exciting to be closing on this transaction having plenty of capital to really execute that in scale and ***extremely rapidly in 2021 and beyond***.

310.   The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

311.   On December 1, 2020, Pivotal amended the October 2, 2020 Registration Statement by filing Form S-4/A with the SEC (the "December 1, 2020 Amendment"), which was signed by Ledecky and Brady, and signed by Ledecky as attorney-in-fact for each member of the Pivotal board of directors (including Griffin).

312.   On December 8, 2020, the October 2, 2020 Registration Statement (as amended) was declared effective and Pivotal released the December 8, 2020 Proxy/Prospectus for Pivotal's annual meeting to be held on December 21, 2020 where the Business Combination would be voted

on. The December 8, 2020 Proxy/Prospectus formed part of the October 2, 2020 Registration Statement (as amended). The December 8, 2020 Proxy/Prospectus contained a notice of annual meeting signed by Ledecky, "By Order of the Board of Directors" of Pivotal.

313.    The December 1, 2020 Amendment and the December 8, 2020 Proxy/Prospectus repeated the false and/or misleading statements above, which were false and misleading for the same reasons set forth *supra*.

314.    On December 11, 2020, XL issued a press release entitled, "XL Fleet Launches Pilot Program with Essential Utilities, Inc. to Electrify its Utility Fleet." In addition, on December 11, 2020, Pivotal attached a copy of the press release as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC. The December 11, 2020 press release stated:

> "XL Fleet's electrified powertrain technology is a perfect fit for companies like Essential, who are looking to ***immediately electrify their fleet vehicles***, but also have demanding drive cycles and performance requirements that need to be met," said Brian Piern, Vice President of Sales and Marketing at XL Fleet.

315.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

316.    On December 22, 2020 Pivotal issued a press release entitled, "XL Fleet, a Leader in Commercial Vehicle Electrification, and Pivotal Investment Corporation II Announce Closing of Merger; XL Fleet to Trade on NYSE as 'XL'". The press release touted the Company's "growth strategy," "firmly established supply chain, and deep OEM relationships," and "highly scalable business model":

> "Today is a significant milestone for XL Fleet and our employees and an important step forward for the commercial vehicle industry as we transform commercial fleets to build a more sustainable world," said Dimitri Kazarinoff, XL Fleet's Chief Executive Officer. "The closing of our merger with Pivotal will empower us to ***accelerate our growth strategy*** and bolster the industry's most comprehensive fully

integrated fleet electrification platform, encompassing real-time data monitoring and analytics, propriety powertrain technology, power management, charging and storage. ***Our tested products, strong presence in the U.S. and Canada, firmly-established supply chain, and deep OEM relationships position XL Fleet as the partner-of-choice*** for our blue-chip customer base who recognize us as a key partner in helping them to meet their sustainability goals efficiently and at a lower cost."

\*     \*     \*

"We appreciate the overwhelming support received from shareholders of Pivotal, including 99.88% votes cast in favor of the merger between Pivotal and XL Fleet," said Mr. Ledecky. "We are exceptionally proud of XL Fleet's success to date and are excited to continue to support the Company and its talented team as it transitions to the public markets. With thousands of proven systems on the road today, millions of miles driven by hundreds of customers in mission-critical applications, and an asset light, ***highly scalable business model***, I believe that XL Fleet is poised to realize its vision of becoming a world leader in fleet electrification."

317.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

318.    On December 23, 2020, Hynes was interviewed on CNBC and was asked about the Company's growth projections and Hynes touted the Company's sales pipeline and their ability to meet the market's strong demand:

Q: I think 2020 forecasted revenue of 21 million, 2021 75 million, but then 2024 forecasted 1.4 billion. How do you get to that number? What is your expectation in terms of some of those different levers that you just laid out for growth?

Hynes: Well, we're growing extremely quickly; we're tripling our revenue in the middle of a pandemic, and I think we would we could have done more without the pandemic. So ***we have a great pipeline going into 2021*** and we also have a very good platform to build off of and introduce a lot more technology and product offerings....

We're clearly leading, shipping hundreds of units per month right now. ***So we're in a great position to really expand with the market, which clearly has a lot of demand***.

319.    The above statements were materially false and/or misleading when made and/or

omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*.

320.    On January 13, 2021 the Company filed a Registration Statement on Form S-1 with the SEC and on January 22, 2021, the Company filed a related Prospectus with the SEC (the "January 22, 2021 Prospectus"), which formed part of the January 13, 2021 Registration Statement. The January 13, 2021 Registration Statement was signed by each member of the XL Fleet board of directors (including Kazarinoff, Hynes, Ledecky, and Griffin).

321.    Both of the January 13, 2021 Registration Statement and the January 22, 2021 Prospectus contained the same false and/or misleading statements[21] above, which were false and misleading for the reasons set forth *supra*.

322.    The January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus both stated:

> Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the ***resolution of battery supply issues***, increased end customer demand and increased order sizes. During the quarter ended September 30, 2020, ***we, along with our suppliers and OEMs, made improvements to our supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on our business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog***. Based upon our current production throughput and our current backlog of orders, and subject to any further ***unforeseen supply chain disruptions caused by the COVID-19 pandemic***, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.

\*        \*        \*

---

[21] These statements in the January 22, 2021 Prospectus contained the same language except that "XL" was replaced with "we" and "XL's" was replaced with "our" given that the Business Combination had been finalized.

Revenues increased by $3.74 million, or 144.2%, from $2.59 million in the three months ended September 30, 2019 to $6.33 million in the same period in 2020. The increase was primarily due to the resolution of battery supply and in OEM vehicle production and due to increased end customer demand for our systems. ***We and our suppliers and OEMs have been making improvements in our supply chain during the second half of 2020***, including sourcing an additional battery supplier, all of which have been impacted by the COVID-19 pandemic. This third quarter revenue increase was attributable to the ***aforementioned resolution of the first and second quarter supply chain challenges***, which allowed us to ramp up production and ship an increasing number of kits to help fulfill our outstanding backlog of customer orders. ***Based upon our current production throughput, we believe that we can produce and sell more kits in the fourth quarter than in the third quarter, which we believe will enable us to fulfill even more of our outstanding backorders***. This said, it is very difficult for us to precisely gauge the impact on us, our suppliers and our customers given the uncertainties surrounding the COVID-19 pandemic and the geo-political and economic climate. Based upon our current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.

323.    The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were materially false and/or misleading when made because: (i) The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019; (ii) The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID; (iii) The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and (iv) The statements misleadingly suggested that the battery supply issues had been "resolv[ed]" and failed to disclose that the "improvements to XL's supply chain" were insufficient to secure enough batteries for the massive expansion of production that was contemplated by XL's revenue forecast for 2021.

324.   On March 8, 2021 the Company issued a press release responding to Muddy Waters, which stated in part:

> In fact, **XL Fleet's management team has a track record of successfully navigating global supply chain challenges** and a highly competitive operating environment. For example, in 2019, XL Fleet, as well as major vehicle manufacturers, were impacted by a component shortage that affected battery supply. **XL Fleet has since established a more robust and reliable supply chain**, and now has multiple battery suppliers and proprietary battery packs in place.

325.   The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the adverse facts set forth *supra*. In addition, the statements were materially false and/or misleading when made because: (i) At the time that XL made this statement, XL was experiencing severe supply shortages that would cause XL to record only $675,000 in revenue for Q1 2021 and to withdraw its full-year revenue forecast for 2021 of $75 million. By the time this statement was made, Q1 2021 was already more than two-thirds complete, so Defendants already knew that the supply shortages were having a material adverse effect on XL's financial results. A little more than three weeks after XL issued this denial of the Muddy Waters allegations, XL was forced to admit that it had not able to fill any orders for "a lengthy period early in the year" due to "ongoing OEM delays, amid microchip and other shortages"; (ii) It was materially misleading for XL to aggressively deny Muddy Waters' allegations that XL suffered from serious supply chain problems at the very moment that XL was in the middle of a production shutdown due to supply chain problems; and (iii) The context of Muddy Waters' allegations rendered XL's statements particularly misleading. Muddy Waters had claimed that XL "had significant supply chain woes indicative of a bit player" and that "XL has been subject to supply shortages for years." XL responded by claiming it had "a track record of successfully navigating global supply chain challenges" and that, notwithstanding battery supply problems in 2019, XL

had "since established a more robust and reliable supply chain." Even if the battery supply issues had been completely resolved and the Q1 2021 supply issues related entirely to different components XL's touting of its supply chain capabilities misled investors as to present, known conditions that directly undermined Defendants' revenue projections.

326.    As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## IX.    DAMAGES TO THE COMPANY

327.    The Company has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, the Company has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.    costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b.    substantial loss of market capital;

c.    costs already incurred and to be incurred defending the Related Securities Action;

d.    costs already incurred and to be incurred defending the State Class Action; and

e.    any fines or other liability resulting from the Company's violations of federal law.

328.    In addition, Spruce Power's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of

management are now in serious doubt.

329.     The wrongdoing complained of herein has irreparably damaged Spruce Power's corporate image and goodwill.  For at least the foreseeable future, Spruce Power will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Spruce Power's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

330.     Plaintiff brings this action derivatively in the right and for the benefit of Spruce Power to redress injuries suffered, and to be suffered, by Spruce Power as a direct result of violations of federal securities laws by the Defendants. Spruce Power is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

331.     The Board of Spruce Power, at the time this action was commenced, consisted of Defendants Griffin, Hayes, Ledecky, and related party non-defendants, Fong, Miller, and Tech, a total of six (6) individuals. As such, Plaintiff is only required to show that three of the Company's directors cannot exercise independent objective judgment as to whether to bring this action.

332.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Spruce Power Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Ledecky Because of His Principal Professional Occupation as the Company's CEO

333.     Defendant Ledecky was the Company's CEO and the Board's Chairman.

Defendant Ledecky remains on XL Fleet's post-merger Board. In his role as CEO of the Company for the fiscal year 2021, Defendant Ledecky received $269,501 in total compensation. The Company does not claim that Defendant Ledecky is an independent director and because his primary source of income and primary employment is his employment as CEO of Spruce Power and his professional reputation is inextricably bound to his role at Spruce Power. Defendant Ledecky is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendants Hayes, Griffin, and Ledecky**

334.    Demand is futile as to Defendants Hayes, Griffin, and Ledecky due to their respective roles leading up to Pivotal's merger with XL Hybrids.

335.    As Pivotal directors and officers, and as the primary beneficial owners of Pivotal's sponsor, Defendants Ledecky, Griffin, and Brady were substantially involved in all aspects of Pivotal's merger with XL Hybrids, including Pivotal's due diligence. From Pivotal's substantial due diligence activities, the Pivotal Defendants had access to detailed information revealing the truth about XL Hybrids' business.

336.    In the December 8, 2020 Proxy/Prospectus, Pivotal represented to investors that "in analyzing the Business Combination, Pivotal's board of directors conducted significant due diligence on XL."

337.    On July 24, 2020, XL Hybrids and Pivotal entered into a non-disclosure agreement, after which XL Hybrids began providing financial projections and other due diligence materials to Pivotal, including through an electronic data room. From July 24, 2020 through the September 17, 2020 signing of the merger agreement between XL Hybrids and Pivotal, representatives of Pivotal and its legal counsel conducted due diligence of XL Hybrids through document review and numerous telephone conference calls with representatives of XL Hybrids and its legal counsel.

338.    According to the December 8, 2020 Proxy/Prospectus, "Pivotal's diligence covered various areas, including, among others, commercial operations and contracts, financial results, litigation, legal compliance, intellectual property, tax and general corporate matters," and "Pivotal conducted further diligence, including calls with XL suppliers, customers, and investors, as well as competitors and industry experts, which diligence focused on, among other things, XL's products, market share, and future prospects, as well as the outlook for the sector more generally." Based on this initial due diligence process, Pivotal decided to pursue further diligence.

339.    On August 6, 2020, Pivotal submitted a list of preliminary diligence requests to XL Hybrids. From August 6, 2020 through the September 17, 2020 signing of the merger agreement between XL Hybrids and Pivotal, "representatives of Pivotal and its advisors conducted further analysis and held conference calls with representatives of XL regarding XL's business plan, financial projections, technology and addressable market and continued their extensive business, financial, accounting, tax and legal due diligence investigations of XL."

340.    Defendants Ledecky and Griffin, among others, participated in video conference meetings on July 27-28, 2020 between Pivotal and XL Hybrids, and their respective legal and financial advisors, at which XL Hybrids' business was discussed.

341.    On September 16, 2020, at a video conference meeting at which Defendants Brady and Griffin were present, Defendant Ledecky gave an extensive presentation about the proposed merger of Pivotal and XL Hybrids to Pivotal's board of directors, and such presentation focused on matters "including potential risks relevant to XL's business."

342.    Pivotal continued its due diligence after the Merger Agreement was signed, investigating and evaluating XL Hybrids' business operations and prospects and ensuring the Merger closing conditions were met, including "the accuracy of the representations and warranties

of XL Hybrids (subject to certain bring-down standards)."

343.    In late November 2020 or early December 2020, prior to the December 21, 2020 vote on the Business Combination, FE3 was contacted by an individual who represented himself as an attorney for Pivotal, who claimed to be conducting due diligence related to the Merger.

344.    FE3 told Pivotal's attorney about the XL Hybrids' overstated sales pipeline and issues with XL Hybrids' products. Pivotal's attorney asked if he could have more people on the call and call FE3 right back. FE3 was contacted a short while later with approximately four or five other people on the phone and talked to them for a total of 90 minutes.

345.    FE3 said the main topics discussed on the Pivotal call were issues with the ROI (meaning the miles per gallon misrepresentations which indicated the technology did not work as promised), the overstated sales pipeline, and how XL Hybrids could not sell its products in California due to losing its CARB certification.

346.    FE3 was told the Pivotal representatives would be contacting FE3 again in the future and possibly a number of times; however, FE3 was not contacted again by any Pivotal representatives.

347.    On information and belief, Plaintiff alleges that the information conveyed by FE3 to the Pivotal representatives was collected as part of the due diligence procedures conducted in relation to the merger, and, in the normal course, this information would have transmitted to Pivotal management, including Defendants Ledecky and Griffin. Accordingly, the material information provided by FE3 to Pivotal regarding XL's Hybrids' inflated sales pipeline, technology and operations constituted a red flag that should have, at the very least, prompted further investigation by Pivotal before it consummated the merger.

348.    Moreover, as a member of the board of directors of XL Hybrids, it is reasonable to

infer that Defendant Hayes would have been well aware of the same information as set forth above.

349.    Accordingly, the Defendants Hayes, Ledecky, and Griffin face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

<u>**Demand is Futile as to the Members of the Audit Committee**</u>

350.    Demand is futile as to Defendants Hayes, Ledecky, Sclarsic, Frodl, and Ramdev (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

351.    The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties and purpose of the Audit Committee are set forth *supra*.

352.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

353.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

<u>**Demand is Futile as to the Director Defendants**</u>

354.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

355.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

356.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

357.     Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Securities Action Defendants for
### Contribution Under Section 10(b) of the Exchange Act,
### Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

358.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

359.    As a result of the conduct and events alleged above, Spruce Power has been named as a defendant in the Related Securities Action brought on behalf of Spruce Power shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

360.    Federal law provides Spruce Power with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Spruce Power has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Spruce Power to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

361.    Accordingly, Plaintiff, on behalf of Spruce Power, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Spruce Power under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Spruce Power.

362.     Spruce Power claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## Allegations Regarding the Securities Action Defendants

363.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.

These statements were materially misleading to persons who purchased Spruce Power securities during the Relevant Period.

364.   The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Spruce Power securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

365.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

366.   The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

367.   When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Spruce Power, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

368.   Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Spruce Power were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of

Spruce Power.

### Allegations Regarding the Securities Action Defendants as Control Persons

369.    In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Spruce Power in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

370.    The Securities Action Defendants were "controlling persons" of Spruce Power within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

371.    Plaintiff hereby derivatively claims such right of contribution on behalf of Spruce Power.

### COUNT II

### Against the Pivotal Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. §240.14a-9

372.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

373.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

374.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

375.    The Pivotal Defendants had control over the Company and caused it to disseminate false and misleading Proxy Statements on December 8, 2020 (the "Proxy").

376.    The Proxy successfully solicited shareholders to approve the Merger. The Proxy stated that "XL's valuation was attractive compared to its competitive peers, the historical performance of XL and the potential for future growth in revenues and profits of XL and a $220 million 12-month sales pipeline." The Proxy further stated that "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

377.    These representations in the Proxy were materially false and misleading, and/or omitted material facts to make the statements not misleading, when issued, as further set forth in detail herein.

378.    The above referenced Pivotal Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the above referenced Proxy were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the Merger.

379.    The Company was damaged as a result of the material misrepresentations and omissions in the above referenced Proxy.

380.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

381.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

382.    The Individual Defendants owed and owe Spruce Power fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Spruce Power the highest obligation of good faith, loyalty, and due care.

383.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Spruce Power shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

384.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Spruce Power to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Spruce Power and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

385.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

386.    Plaintiff, on behalf of Spruce Power, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

387.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

388.    By his wrongful acts and omissions, the Securities Action Defendants were unjustly enriched at the expense of and to the detriment of Spruce Power.

389.    The Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Spruce Power.

390.    Plaintiff, as a shareholder and representative of Spruce Power, seeks restitution from the Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

391.    Plaintiff, on behalf of Spruce Power, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Waste of Corporate Assets**

392.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

393.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

394.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and

(c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

395.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

396.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Spruce Power and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Spruce Power the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Spruce Power and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Spruce Power and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.      Determining and awarding to Spruce Power exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.      Awarding Spruce Power restitution from Defendants, and each of them;

F.      Awarding Spruce Power Contribution from the Securities Action Defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2023                        Respectfully submitted,

By: */s/ Joshua M. Lifshitz*

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Toby Boyce hereby declare as follows:

I am shareholder of XL Fleet and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 09/28/2023

Signature